Keating, J.
The Hudson Rapid Tubes Corporation and the Hudson and Manhattan Corporation were the owners and operators of an interurban electric railroad system commonly known as the Hudson Tubes. The facility which has been in operation since 1911 carries some 28,000,000 passengers yearly and over 24% of the daily rush hour commuters between New York City and its New Jersey suburbs.
The Tubes have not, however, achieved the financial success which these figures might indicate. From its inception the Tubes encountered financial difficulty which continually plagued its operation. These difficulties, though initially due to the poor financial structure of the corporation as well as inefficient management, were compounded in recent years by a tremendous decline in the number of commuters as well as increasing labor costs.
The construction of bridges and tunnels opened the gates of New York City to millions of automobile and bus commuters who would otherwise use the Tubes. In addition, improved labor conditions since the 1930’s served not only to increase the cost of operating the facility but also contributed to the passenger decline by reducing the work week from 6 to 5 days. All these factors combined accounted for a decline in passengers from 113,142,000 in 1927 to 28,000,000 in 1964.
Moreover, the ready availability of alternative forms of transportation via the tunnels and bridges limited the effectiveness of fare increases in coping with the desperate financial situation brought about by the loss in passenger- service and increased labor and maintenance costs.
The situation was such that the corporation which had operated the Tubes was forced into reorganization under the Bankruptcy Act. In this reorganization, completed in 1961, all the shareholder interests, both common and preferred, were wiped out; unsecured creditors were paid in cash at the rate of 10 cents on the dollar and the railroad operation was severed from the building structures in order to prevent the deficits of the former from causing the financial demise of the latter. Under the plan, the building properties were placed in a new *465 entity, the Hudson and Manhattan Corporation, while the railroad operations were to be conducted by a wholly owned subsidiary, the Hudson Bapid Tubes Corporation. The latter was provided with approximately $500,000 in cash, an amount woefully inadequate to meet the long-neglected maintenance needs of the corporation.
Yet, despite its poor financial condition, the Tubes remained an essential public facility, without which the remaining interstate facilities were incapable of transporting the thousands of persons who commuted daily between New York City and New Jersey.
Given the essentiality of this facility and, faced not only with the bleak past but with the dim financial future of the Tubes, the Legislatures of both the States of New York and New Jersey determined that the continued operation of the facility could only be continued under public ownership. Therefore, pursuant to bi-State legislation (L. 1962, ch. 209; N. J. L. 1962, ch. 8), the petitioner, Port Authority Trans-Hudson Corporation (PATH), a wholly owned subsidiary of the Port of New York Authority, condemned the property of both the Hudson and Manhattan Corporation and the Hudson Rapid Tubes Corporation.
The Supreme Court (Special Term) made an award of $55,000,000 to the Hudson Rapid Tubes Corporation for its railway property and an award of $17,996,000 to the Hudson and Manhattan Corporation for its buildings. Interest on the Hudson Rapid Tubes award was granted at the rate of 4% per annum on that portion of the property situated in New York State and at the rate of 6% on the physical assets situated in New Jersey. By stipulation, the railway properties were allocated 65% to New Jersey and 35% to New York. Interest on the award to the Hudson and Manhattan Corporation for its real property was also limited to 4%.
The Appellate Division, two Justices dissenting, modified the award to Hudson Rapid Tubes from $55,000,000 to $3,500,000. The basis of the Appellate Division’s ruling was that, because of the poor financial condition of the corporation, there would be no prospective commercial purchasers available on the open market and, therefore, under traditional rules, the only value which the property had to its owners was liquidation or *466 scrap value. The Appellate Division also reduced the rate of interest on the properties situated - in New Jersey from 6% to 4%.
The claimant-appellant, Hudson Rapid Tubes Corporation, appeals from the Appellate Division order, alleging that the court erred in predicating its award on salvage or scrap value. It asks us to increase the award to $127,000,000. In addition, it asks reinstatement of Special Term’s interest award of 6% on the New Jersey property and, along with its parent, Hudson and Manhattan Corporation, it asks us to strike down as unconstitutional New York’s statutory award of 4% interest as it applies to the New York property for the period after January 1, I960.[1]
The condemnor, Port Authority Trans-Hudson Corporation, also appeals from so much of the order of the Appellate Division as included in its award $500,000 cash which was not appropriated.
The first and most important issue which must be decided on this appeal is the question of what constitutes just compensation to the owner and operator of an essential public facility when its property is condemned for continued dedication to the same use to which the owner had dedicated the property. It is essential to the resolution of this question to consider first what was actually taken. Special Term divided the property into two classes, the tunnel property and the non-tunnel property.
The tunnel property upon which it placed an evaluation of $30,000,000 included:
• (a) Four single-track railway tunnels under the Hudson River, two 6,600 feet long and the other two 6,000 in length— making a total of 25,200 feet, or about 4% miles of subaqueous tunnels.
(b) Subterranean tunnels or subways, which connect the river tunnels to the railway’s terminals — at Church Street and at 33rd Street in Manhattan and at Hoboken and Jersey City— including nine stations which are integral parts of these subway tunnels. The entire railway system measures, as double track, 7.9 miles in length, of which the subterranean tunnels or subways are about 5.4 miles in length.
*467 For this property, which would cost in excess of $400,000,000 to reproduce and would require an expenditure of only $88,000 to put in perfect working order, the Appellate Division awarded virtually nothing,' since the property would in liquidation bring at most a nominal sum, if that.[2]
The non-tunnel property, for which Special Term awarded $20,000,000 plus an additional increment of $5,000,000 for going concern value, included :
(a) Generally speaking, all the non-tunnel properties, including 223 passenger cars;
(b) the signal system, track and roadbed;
(c) electrical transmission, distribution system, communication system and compressed air system;
(d) structures, including repair shops, electrical substations and surface passenger stations;
(e) emergency fans and blowers, tunnel drainage and sewage ejection systems; and
(f) shop equipment, tools, change booths, turnstiles, etc.
For this non-tunnel property, the Appellate Division awarded approximately $3,000,000. Of this, $1,700,000 covered the cost of recently purchased railroad cars and $1,300,000 the remainder. The Appellate Division also held that, because of the unprofitability of the business enterprise, no separate award for going concern value was justified.
We hold that the Appellate Division erred in its disposition, that its decision, particularly as it relates to the tunnel property, reaches a harsh and unjust result and is neither compelled nor warranted by precedent.
The Appellate Division correctly observed that the traditional rule which has evolved in condemnation cases is that just compensation requires that the property owner be awarded in cash an amount equivalent to the value which the property had in his hánds —i.e., the sum of money which he could have realized in an uncoerced sale in the open market to a willing buyer. More precisely stated, the rule is that just compensation requires only that the condemnee be paid for what he has lost and not for what the taker has gained.
*468 A problem like this, however, cannot be dealt with dogmatically. One commentator has described ‘ value to the taker ’ ’ as being ‘ ‘ One of the most confusing aspects of the theory of valuation under the law of eminent domain ” (1-Orgel, Valuation Under Eminent Domain [2d ed., 1953], p. 351). The decisions are not always helpful. The oft-cited opinions of Mr. Justice Holmes in City of New York v. Sage (239 U. S. 57) and McGovern v. City of New York (229 U. S. 363) both dealt with the claim of a farmer whose property was taken, along with many other parcels, to establish a reservoir site. The court correctly rejected the owner’s claim that he be compensated on the basis of reservoir values, since the reservoir was created by the assemblage made possible solely by the condemnation itself.
The present case is in sharp contrast. We are here concerned with a property which has a usefulness created by the owner himself through the expenditure of large sums of money and by the continued operation of the property for the very purpose for which the petitioner is acquiring the property. It is the owner who built the “ reservoir ” — the Tube railway system in the present case. This owner has developed its property at a cost of millions of dollars and operated it for more than 50 years. It is admittedly of great usefulness in the daily transportation of thousands of commuters. A condemnor should not be permitted to tell him: “ It’s only worth scrap or less ”,
While the rule which was applied by the Appellate Division is one of general acceptance (1 Orgel, Valuation Under Eminent Domain, supra, p. 353) and achieves a reasonable and just result in most cases, neither this court nor the Supreme Court of the United States has ever attempted “ to prescribe a rigid rule for determining what is ‘ just compensation ’ under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when the market value has been too difficult to find, or when its application would result in manifest injustice to the owner or public, courts have fashioned and applied other standards.” (United States v. Commodities Corp., 339 U. S. 121, 123 [emphasis added]; United States v. Virginia Elec. Co., 365 U. S. 624.)
Thus, in Matter of City of New York (265 N. Y. 170), involving the condemnation of an elevated railroad spur for the purpose *469 of destruction, we sustained an award for the easements of light and air for which the eondemnee was required to pay when it constructed the elevated railroad. Although the railroad facility in question was losing money and the easements had no value to the railroad upon the cessation of operations, we upheld an award predicated upon original cost. Chief Judge Pound, speaking for the court, wrote (p. 181): “ The contention of the city, that the railroads are entitled to no compensation, is based on the argument that these rights were of no use to the railroads except as they were compelled to acquire them to operate and of no value except to a going concern, has some logical force, but such rights were obtained in order to permit the roads to exercise their franchise in the street in perpetuity, and when the city terminated such rights it should fairly compensate the roads for the loss of such rights.”
It is true that we sustained in that case an award of scrap value for the actual structures. Unlike the case at bar, however, the structures were useless and were being condemned for destruction. Likewise, no award was allowed for the franchise which the corporation received without cost from the State, albeit they were required to expend large sums of money to acquire the easements. The court quite properly felt that the reimbursement for the cost of these easements was sufficient under the circumstances.
We note that the Supreme Court in affirming our decision as to the value of the structure wrote: ‘ The structure was appraised as junk, the city having undertaken to bear the cost of removal. Such mi appraisal might he too low were it not for the award for the private easements. To realize the value of those easements, an abandonment of the spur was necessary. ‘ The railroads could not release their rights to the abutting owners and continue to operate their railroads in the street. ’ * * * The structure in the circumstances had no value except as scrap.” (Roberts v. City of New York, 295 U. S. 264, 284, per Cardozo, J. [emphasis added].)
Most recently in Matter of City of New York (Fifth Ave. Coach Limes) (18 N Y 2d 212, 225) we likewise departed from the general rule where to do otherwise would have, in the words of the Supreme Court, resulted in “manifest injustice to the *470 owner” of the property. In that case both lower courts and this court awarded amounts far in excess of what could have been realized on the open market because of the financial condition of the condemnee. We felt it would not conform to traditional standards of equity and justice to permit the city to break the company financially and then pick up the pieces at a highly depreciated rate.[3]
We are well aware of the distinction between this case and cases we have just cited and discussed. Nevertheless, the common thread which runs through all of them is that just compensation requires a result which is “‘just’ both to an owner whose property is taken and to the public that must pay the bill ”. (United States v. Commodities Corp., 339 U. S. 121, 123, supra.)
Can it be said by any objective standard that an award of scrap value — nothing■—is fair and just for the tunnel property, an essential part of an essential public facility, which cost some $32,000,000 to construct, which would cost in excess of $400,000,000 to reproduce and which, with some minor expenditures, will function as good as new for an indefinite period? We think not. As the Supreme Court noted in another context: “ It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its ‘ junk value.’ ” (Denver v. Denver Union Water Co., 246 U. S. 178,191 [1918].)
On the other hand, we cannot ignore the factors which militate against a recovery of the kind suggested by the condemnee. We cannot ignore the unprofitability of the corporation. That is a very significant factor. We cannot ignore the reasons for this unprofitability. Nor can we ignore the fact that, while these tunnels are adequate to meet the needs of the condemnor for an indefinite period of time, their construction and design left something to be desired 50 years ago and that, if a new facility were being constructed, it would be structured in such a manner as to insure adaptability to the modern means of *471 transportation which are likely to be developed as we progress into the 21st century.
Considering all these factors, we believe that the award of $30,000,000 made by Special Term and predicated on the conclusion that the condemnees should at least be repaid for the depreciated original cost of the tunnels is fair and just and that an award either considerably above or below that figure would be “ manifestly unjust ” to the owner whose property is taken and the people who must pay the bill.
As to the non-tunnel property we believe, for the same reasons outlined above, that the Appellate Division erred in awarding scrap value solely on the basis of unprofitability of the enterprise. On the other hand, the award of $20,000,000, allowed by Special Term, on the basis of original cost less an amount for depreciation which had no support in the record, is arbitrary and cannot be sustained.
The record reveals that much of the non-tunnel property was severely deteriorated, and that an expenditure of almost $32,000,000 would be necessary to rehabilitate the non-tunnel property whereas only $88,000 was all that would be required to restore the tunnels. In addition, the record indicates that, despite rising costs of labor and equipment, the original cost of the non-tunnel property exceeded the depreciated reproduction cost of that property and the award made by Special Term was only some $3,000,000 less than the depreciated reproduction cost. By comparison, the award for the tunnel property, which gave effect to the unprofitability factor, was less than one fifteenth the depreciated reproduction cost. It is thus clear that Special Term not only failed to give effect to the physical and technological obsolescense of the property but that it also apparently ignored the enormous expenditure which was required to rehabilitate the property and did not give any significant effect to the unprofitability factor.
We believe that this portion of the case must be remanded to Special Term for a determination of just compensation based upon all the factors which we have outlined.
Similarly, we believe that Special Term erred in awarding $5,000,000 for going concern value by taking 10% of the total award for tangible property. "While there is evidence that such *472 a value exists in this case, there is no proof in the record to sustain Special Term’s finding that the claimant is entitled to an award of an additional 10% of the values fixed for the tunnel and non-tunnel properties. There is no basis or warrant in law for any such, rule of thumb. A finding of going concern value must be based upon evidence paralleling what we held would have to be shown in the Fifth Ave. Coach case (18 N Y 2d 212, 221-222, stipra), that is, the cost of organizing and systematizing the enterprise, such as the cost of developing operating schedules, operating records, systems of procedure and the training of personnel.[4] To the extent that unprofitability is evidence of inefficient organization that factor must be considered in determining the award.
Before going on to discuss the remaining points, a brief discussion of New Jersey law is appropriate. Under the bi-State legislation authorizing the condemnation of property by the Port of New York Authority (L. 1961, ch. 312, § 14; N. J. Stat. Ann., § 32:1-35.63) we are required to apply New Jersey law to that portion of the property located in New Jersey. The New Jersey law in this area is similar to the general rule which prevails in this and the Federal jurisdiction. (Currie v. Waverly & N. Y. Bay R. R. Co., 52 N. J. L. 381, 395; City of Trenton v. Lenzner, 16 N. J. 465, 478, cert. den. 348 U. S. 972.) For the reasons we have outlined, we regard this case as sui generis and one which requires an approach different from that generally followed. Indeed, the few cases in other jurisdictions which are similar to the one at bar have also departed from the general rule (see 2 Orgel, Valuation Under Eminent Domain [2d ed.], § 217).
We of course cannot state with certainty what approach our • *473 brethren on the New Jersey Supreme Court would take to this problem. Perhaps they would award less — perhaps more. We must, however, decide the case and we believe that, because of the manifest injustice of awarding scrap value, it is not unreasonable to assume that the view we have taken would be adopted by that court.
We turn now to the award of interest. The contention made by both condemnees regarding the unconstitutionality of the New York statute limiting the award of interest to 4% was made and rejected in Matter of City of New York (Fifth Ave. Coach Lines) (supra, cert. den. on this particular issue 386 U. S. 778). No substantial reason has been suggested requiring a different result in the case at bar.
We agree, however, with the Hudson Rapid Tubes’ contention that the Appellate Division erred in reducing the interest award on the New Jersey property from 6% to 4%. The argument advanced by the condemnor is that New Jersey has no statute regarding the payment of a specific rate and that the New Jersey courts, in considering the rate of interest to be awarded, would give some weight to the fact that the condemnee’s enterprise was operating at a loss and would, therefore, award only 4% interest instead of the usual 6%. This argument, however, overlooks the fact that the condemnee is entitled to the principal award for the taking of its property from date of the taking and that the award of interest compensates for the failure to make such payment. It is most inequitable and, indeed, unconstitutional, we believe, to penalize the condemnee for the delay which has resulted in the most part from the litigation which it has engaged in to protect its own rights. Moreover, the unprofitability aspect has already been taken into consideration in determining the initial award. To consider that fact again in determining the rate of interest is unfair and is not permitted or sanctioned either by the Constitution of the United States or New Jersey law. (United States v. Klamath Indians, 304 U. S. 119, 123; State v. Seaway, 46 N. J. 376, 380.)
The award of 6% is fair and proper under New Jersey law (Cohrs v. Igoe Bros., 71 N. J. Super. 435, 448) and the Appellate Division’s determination in this regard should be rejected and Special Term’s accepted.
*474 To summarize:
On appeal by the claimant Hudson Rapid Tubes Corporation, the order of the Appellate Division should be modified, with costs in this court and in the Appellate Division to the claimant, to the extent of (1) reinstating so much of the decree of Special Term as awarded $30,000,000 for the subway and tunnel properties and as fixed the rate of interest applicable to the award for the New Jersey properties, and (2) remanding to Special Term for further consideration, in accordance with the opinion herein, questions relating to the determination of value for the remaining properties and going concern value and, as so modified, affirmed.
On the appeal by the claimant Hudson and Manhattan Corporation, the order of the Appellate Division should be affirmed, without costs.

. This is the only portion of the order of the Appellate Division from which the Hudson and Manhattan Corporation appeals.

. Indeed, it. appears, that upon liquidation it would cost at least $100,000 to plug up the tunnels.

. We reached this conclusion despite the fact that the condemnee had never in fact complained about the validity of the rates and without any finding that they Were constitutionally invalid.

. The argument forcefully advanced in the dissenting opinion is that “ [e]conomic viability, i.e., the capacity to operate at a profit, is, as the Fifth Ave. opinion makes clear, the sine qua non for an award of going concern value.” The only opinion in the Fifth Ave. case which clearly outlines that position is the dissenting opinion. Judge Burke, speaking for the majority, wrote:
“ The argument made by the respondent [condemnor] that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospects was made long ago and rejected.” (18 N Y 2d 212, 223.)