In the Matter of **PENN CENTRAL TRANSPORTATION COMPANY,** Debtor.

In re **PHILADELPHIA AREA COMMUTER SERVICE.**
No. 70–347.

United States District Court, E. D. Pennsylvania.
March 18, 1974.

---

1. In light of this ruling, a motion to compel these answers should be unnecessary.

**1124**

Carl Helmetag, Jr., Philadelphia, Pa., for the trustees, PCTC.

Ballard, Spahr, Andrews & Ingersoll, by Frederic L. Ballard, and Alan Fellheimer, Philadelphia, Pa., for Girard Trust Bank, Pennsylvania Railroad Indenture Trustee, and Institutional Investors, Penn Central Group.

Ballard, Spahr, Andrews & Ingersoll, by Richardson Blair, Philadelphia, Pa., for Girard Trust Bank.

Willkie, Farr & Gallagher, by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Central Group.

Sullivan & Worchester, by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Spencer Ervin, Jr., and Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, N. Y., New Haven & Hartford RR Co.

Jones, Day, Cockley & Reavis, by Leigh B. Trevor, Cleveland, Ohio, for National Rail Passenger Corp.

Morgan, Lewis & Bockius, by John N. Schaeffer, Jr., Philadelphia, Pa., for The Fidelity Bank and Mfg. Hanover Trust Co.

Kleinbard, Bell & Brecker, by John B. Nason, III, Philadelphia, Pa., for Congress of Railway Unions.

Mulholland, Hickey & Lyman, by Geoffrey N. Zeh, Washington, D.C., for Railway Labor Executives Assn.

Fox, Rothschild, O'Brien & Frankel, by Howard R. Flaxman, Philadelphia, Pa., for First National City Bank of New York.

Wolf, Block, Schorr & Solis-Cohen, by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co., indenture trustee.

## OPINION AND ORDER NO. 1507

FULLAM, District Judge.

The Court is confronted with a number of issues concerning the commuter service furnished by the Debtor in the Philadelphia area, and certain proposed arrangements between the Debtor and Southeastern Pennsylvania Transportation Authority (SEPTA) affecting that service.

### I.

*Description of the Service*

The Philadelphia area commuter service embraces some 137 route miles of commuter railroad, serving an average of 35,000 commuters each week-day. The system extends to Trenton, New Jersey, on the north, Newark, Delaware, on the south, and the vicinity of Paoli, Pennsylvania, on the west. Portions of this rail system are devoted almost exclusively to commuter service, but substantial portions are also used for intercity passenger service pursuant to a contract between the Debtor and the Na-

tional Rail Passenger Corporation (Amtrak), and for freight service. The Debtor owns some of the lines, but some are owned by other railroads which lease them to the Debtor. The latter include the Philadelphia, Baltimore & Washington Railroad, the Connecting Railroad, and the Philadelphia & Trenton Railroad, all of which are also in reorganization, as Secondary Debtors in this proceeding.

## II.

### SEPTA

A concise description of SEPTA is found in the opinion of the Commonwealth Court in the case of SEPTA v. Yellow Limousine Service, Inc., 10 Pa. Cmwlth. 572, 312 A.2d 79 (1973):

"SEPTA is an authority formed pursuant to the Metropolitan Transportation Authorities Act of 1963, 66 P.S. § 2001 *et seq.* Its constituent members are the City of Philadelphia and the Counties of Bucks, Chester, Delaware and Montgomery. It is charged by the legislature with the duty of combining, improving, extending and supplementing public transportation systems in the Philadelphia metropolitan area, which systems the Legislature found to be so underdeveloped and obsolete as to have harmed the economic and social health of the area, depreciated property values, reduced tax revenues and generally made the area a less desirable place to live and work . . . SEPTA's mission, as specifically provided by the Act, is that of planning, acquiring, holding, constructing, improving, maintaining, operating, and otherwise functioning with respect to a transportation system in the metropolitan area. . . . ."

SEPTA has been granted the power of eminent domain, but has no taxing power. It is financially dependent upon annual appropriations by the constituent municipalities and by the Commonwealth of Pennsylvania.

## III.

### Background of the Problems

For many years, the service has produced annual operating losses. For the year ended June 30, 1973, the loss was approximately $18 million; and the losses have been increasing each year.

The service has been operated under a series of contractual arrangements between the Debtor and SEPTA, pursuant to which SEPTA has provided subsidies which partially reimburse the Debtor's losses. Until recently, this reimbursement has been calculated on a "solely related" basis (*i.e.*, taking into account only those costs which would be entirely eliminated if the Debtor did not operate the commuter service); for the year ended June 30, 1973, the SEPTA subsidy amounted to $8 million.

For several years, the Trustees of the Debtor have been negotiating with SEPTA with a view toward achieving (a) an acceptable permanent arrangement for the service, and (b) pending consummation of such a permanent solution, acceptable interim subsidy arrangements adequate to cover fully distributed costs plus a return on capital assets devoted to the service.

In mid-1973, these negotiations culminated in a proposed "Memorandum of Understanding," discussed below, and, pending final approval of the Memorandum of Understanding, interim operating agreements providing, in essence, for reimbursement by SEPTA on a fully distributed cost basis, without provision for return on investment. The interim agreement for the balance of 1973 was approved by this Court, but SEPTA has made no payments thereunder because the Commonwealth of Pennsylvania has insisted upon withholding the necessary funds from SEPTA until the "Memorandum of Understanding" is finally approved. Approval of the proposed Memorandum of Understanding has been withheld by this Court, in part because of what I regard as insurmountable objections to the proposals on its

merits (discussed below), and partly in the hope that appellate guidance on these issues would shortly be forthcoming (on September 12, 1973, Judge Ditter approved a somewhat similar Memorandum of Understanding between SEPTA and the Reading Company, and his Order is pending on appeal before the Third Circuit).

More recently, the Trustees have petitioned for leave to withdraw their earlier petition for approval of the proposed Memorandum of Understanding, and a further hearing thereon was held on January 21, 1974. At this hearing, the parties who had originally objected to the Memorandum of Understanding renewed their objections, and also urged the Court not to approve any further interim agreement which did not make adequate provision for return on investment. The Indenture Trustees and institutional investors also asserted, as they had at the original hearing, that this Court should proceed to make findings as to the value of the property devoted to the service, such value to constitute an "upset price" for acquisition of the property by SEPTA, and the basis for calculating return on investment.

These latter issues are somewhat clouded by procedural problems. Counsel for SEPTA was present at the initial hearing, but took no part therein, although it was clear that SEPTA had approved the Memorandum of Understanding, and presumably favored its approval by this Court. Counsel for SEPTA was present at the recent hearing, and participated therein to the extent of providing an explanatory statement of SEPTA's dilemma. The position of the Commonwealth of Pennsylvania is even more anomalous; it did not appear at either hearing, but it is a party to these reorganization proceedings, and was duly notified of both hearings. Its sole contribution to the record in this matter is in the form of a letter to this Court, stating that, notwithstanding SEPTA's approval of the interim agreements, the Commonwealth would not provide the funds for carrying out these agreements, unless and until the Memorandum of Understanding was approved.

## IV.

### The Proposed Memorandum of Understanding

A. *Principal Terms.* The proposed Memorandum of Understanding contemplates an eventual agreement, subject to the conditions precedent mentioned below, which would embody the following provisions:

1. The Debtor would transfer to SEPTA title to all equipment used in the commuter service.

2. The Debtor would lease to SEPTA, for a term of 99 years, all of the real estate used in the commuter service (except for the air rights, treated separately below), but reserving to the Debtor the right to use these facilities for its freight service and for its Amtrak operations, and also reserving to the Debtor certain subsurface rights. At the expiration of the lease, the Debtor would convey the premises to SEPTA, with the same reservations, for nominal consideration.

3. During the term of the lease, SEPTA would have the right, but would not be required, to develop the air rights over the leased premises. Income derived from such air rights (except in the area of 30th Street Station) would be paid to SEPTA until it had recaptured a sum equal to the 1972 loss on the service; thereafter during the term of the lease, income from the air rights would be divided equally between the Debtor and SEPTA. Income from the 30th Street station air rights would be divided equally, without limitation. At the expiration of the lease, all air rights, and the income therefrom, would revert to the Debtor.

4. SEPTA would relieve the Debtor of its obligation to provide commuter rail service. Initially, this would be accomplished by means of an operating agreement, pursuant to which the Debtor would operate the service, and would be reimbursed by SEPTA for its fully

distributed costs. SEPTA would have the right to terminate this operating agreement at any time, and thereafter to operate the service itself.

5. SEPTA would be required to bear all expenses of maintaining the properties, for both freight and passenger service. (The Trustees estimated that this would represent a contribution to freight service expenses at the rate of at least $1.6 million annually.)

From the Trustees' standpoint, the principal advantages of the proposed agreement would seem to be the permanent elimination of recurring annual losses on the commuter service, and a reduction in freight expenses at the rate of approximately $1.6 million annually. In order to obtain these benefits, the Trustees would immediately transfer to SEPTA title to all of the equipment used in the service (part of which has been procured through government grants for that purpose), and would lease to SEPTA the real estate for 99 years and thereafter convey the property to SEPTA (except for the air rights mentioned above, and certain subsurface rights) all for no additional consideration.

It can readily be appreciated that the principal issue on the merits is whether the aggregate of the following amounts would be sufficient to amortize the value of the properties conveyed, at a fair rate of return, over the term of the lease: (a) the benefits to be derived from SEPTA's development of the air rights; (b) the $1.6 million annual contribution to freight expenses; and (c) arguably, the losses which the Debtor would otherwise sustain on the service until the Debtor can terminate, by other means, its obligation to provide the service.

B. *Conditions Precedent.* The proposed Memorandum of Understanding concedes that no agreement pursuant thereto would be executed or carried out unless certain conditions were first satisfied. These are:

1. Appropriation of the necessary funds to SEPTA by the Commonwealth of Pennsylvania. Under the terms of the Memorandum, this was to have been accomplished not later than December 31, 1972. To date, it has not yet occurred.

2. The necessary consent by the lessor railroads, permitting the proposed conveyances. The extent to which such consents are necessary under the terms of the various leases, or under the terms of the various mortgages of the lessors and of the Debtor, are matters which have not been fully developed on this record.

3. The consent of the Secretary of Transportation and of Amtrak. The parties have proceeded on the assumption that negotiations leading to such consents will be successful. The continued opposition of the United States and of Amtrak suggests that these consents have not yet been granted.

## V.

### *Intervening Developments*

On December 13, 1973, I entered Order No. 1404, directing that a further hearing be held on January 21, 1974, on the Trustees' petition for approval of the proposed Memorandum of Understanding, "in order to afford an opportunity to all interested parties to present such additional or supplemental information and argument as they may deem appropriate in the light of developments which have occurred since the previous hearing on the petition." And on January 2, 1974, by Order No. 1422, the scope of the January 21 hearing was enlarged to include not just the proposed Memorandum of Understanding, but also "the terms under which the Trustees will continue to operate the Philadelphia rail commuter service [pending final action on the Memorandum of Understanding or other final arrangements for the service]."

At the hearing on January 21, 1974, the Trustees filed a formal "statement in response to Orders Nos. 1404 and 1422" pointing out that, in view of the enactment of the Regional Rail Reorgan-

ization Act of 1973, effective January 2, 1974, and other developments in the reorganization proceedings, they no longer regarded the proposed Memorandum of Understanding as workable or satisfactory. They therefore filed a motion for leave to withdraw, without prejudice, their earlier petition which had sought approval of the Memorandum of Understanding.

The gist of the Trustees' position is that the proposed Memorandum of Understanding was negotiated on the assumption that the Debtor would, in some form and to some extent, continue to be engaged in the business of, and responsible for, providing rail freight service. While all of the consequences of the passage of the Regional Rail Reorganization Act of 1973 are unknown at this time, it is doubtful that this underlying assumption remains valid. Moreover, it is also doubtful whether the Trustees would have the legal right to carry out the terms of the agreement contemplated by the Memorandum of Understanding. The Trustees suggest that any permanent solution must involve the United States Railway Association established by that statute, because of its responsibility for, and authority over, the "final system plan" for rail service in the region. Until a final solution can be negotiated by all concerned, the Trustees propose to continue their pursuit of satisfactory interim arrangements with SEPTA.

The trustees are clearly on sound ground when they assert that the arrangements contemplated by the Memorandum of Understanding are no longer feasible. Indeed, this conclusion is not challenged by anyone.

It is equally clear, however, that the present impasse cannot be permitted to continue. If the Debtor is to continue to operate the Philadelphia area commuter service, arrangements which conform to constitutional requirements must be promptly established.

## VI.

### *Constitutional Limitations*

▮ Two related principles establish the outer limits of constitutionality in this context: (1) no railroad may constitutionally be required to provide service to the public at a hopeless loss (Brooks-Scanlon Co. v. Railroad Commission of La., 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); and *see* In Matter of Central Railroad Co. of N. J., 485 F.2d 208 (3d Cir. 1973); In re Penn Central Transportation Co. ("Columbus Option Appeals"), 494 F.2d 270 (3d Cir., 1974)); (2) the property rights of secured creditors of a railroad in reorganization may not be impaired for the public benefit, without just compensation. *"Columbus Option"* case, *supra*. The basic approach represented by the proposed Memorandum of Understanding is, in effect, to violate both of these principles, by combining them. The price for elimination of one constitutional violation (recurring losses on the commuter service) would be voluntary submission to another constitutional violation (giving up assets without just compensation).

A transaction such as that proposed in the Memorandum might be supportable if the additional benefits (contribution to freight expenses, plus benefits from air rights) could be viewed as representing adequate compensation for the loss of the assets. This necessarily brings us to a consideration of values.

The Indenture Trustees and Institutional Investors, having gone to considerable trouble and expense in producing extensive evidence on valuation, are understandably anxious to have this Court now make definite findings on that subject. While it may be technically correct that, since SEPTA and the Commonwealth of Pennsylvania were both afforded opportunities to present evidence on that subject, but failed to participate in the hearings, findings could now be made which would be binding upon both, I am reluctant, because of

the public interests involved, to render definitive findings on this record. But I do consider it both necessary and appropriate, for the guidance of the parties in attempting to resolve this matter, to make the following observations:

The Trustees of the Debtor produced evidence to the effect that the net liquidation value of the properties here involved is at least $77.6 million. The Indenture Trustees and other secured creditors produced persuasive evidence, not successfully challenged on this record, to the effect that the net liquidation value is probably closer to $200 million, and is at least $150 million. (Book value, and reproduction cost new less depreciation, are, of course, much higher, in excess of $450 million, but this is largely irrelevant.)

The problems involved in arriving at a fair value for the real assets of an established commuter railroad system which is losing money and has no prospect of profitability are complex indeed. At one end of the scale, it would seem that the property should be worth, at an absolute minimum, "scrap" value, i. e., what the properties could be sold for if the system were dismantled and sold off, over a reasonable period of time, to the highest bidder. To the extent that parts of the property are also used for freight service, and therefore presumably could not be dismantled and sold, this hypothesis is difficult to translate into dollars. This liquidation hypothesis is further complicated by the assertion, on an assumed but not fully developed factual premise, that in the event of permanent abandonment of rail operations, fee ownership of at least some of the roadbed would revert to the abutting owners.

At the other end of the scale, if one assumes a purchaser who needs, desires, and intends to operate, a commuter rail system, such a purchaser should be happy to acquire the property at any price which would represent a saving over reproduction cost new less depreciation.

Thus, when the issue is the determination of proper value for purposes of transactions between the Debtor and SEPTA (whether purchase, lease, subsidy, or a combination thereof), it is apparent that each party is in a position to assert, with some justification, that the transaction should be more costly to the other party than that other party is willing to concede. In the absence of a condemnation, the Debtor is not required to make the property available to SEPTA. It can, eventually at least, simply terminate the commuter service and liquidate the properties. In that event, SEPTA, or some other governmental agency, would undoubtedly find it necessary to incur the staggering costs which would be involved in assembling and constructing its own commuter system. Conversely, however, the Debtor is not in a position to force SEPTA to acquire the properties. At least in theory, SEPTA, by inaction, could see to it that the Debtor never obtained more than scrap value for the properties.

In short, viewed from the perspectives of the two parties involved, the transaction has many of the attributes of a forced sale, or forced purchase, a notably unreliable measure of fair value.

One approach, which has been accepted in other transactions of this kind (e. g., the "Hudson Tubes" case,[1] and the transaction between the Boston & Maine Railroad and the Boston Municipal Transit Authority) is to start with liquidation or scrap value, and add to it an incremental factor for "assemblage." This approach appears eminently reasonable. Perhaps it is but another way of expressing the thought that transactions of this kind simply do not fit into any conventional mold, and that an existing, assembled, operating, commuter rail system has an inherent "going concern"

1. Port Authority Trans-Hudson Corp. v. Hudson Rapid Tubes Corp., 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967), cert. denied 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 (1967).

value which simply cannot be measured by the traditional method of capitalization of earnings.

While a definitive finding, in my view, should not be made on the present, perhaps incomplete, record, I feel obliged to record the observation that, in the absence of persuasive countervailing evidence, the approach taken by the witnesses for the secured creditors, in arriving at their figure of at least $150 million, appears to me to be basically sound.

■ But even accepting the lower figure of $77.6 million scrap value, a transaction similar to that proposed in the Memorandum of Understanding would seem to be unacceptable. The $1.-6 million annual contribution towards freight expenses falls far short of a reasonable return. For present purposes, I see no reason to adopt any different standard than the 7.5% rate determined by the ICC in the Amtrak proceedings. But even if a lower rate were justified, no rate as low as the 1% to 2% range represented by this return could pass muster.

It seems clear, upon analysis, that the air rights feature of the proposed transaction provides no measurable benefit to the Debtor's estate which could be considered in this connection. The Debtor owns these air rights now. If they are capable of producing income or other current values, they could presumably be developed without the intervention of SEPTA. Under the proposed agreement, there is no obligation on the part of SEPTA to develop them, to contribute toward their development, or even to upgrade the commuter system so as to enhance their value for future development.

## VII.

### Conclusions

■ 1. For various reasons, including the enactment of the Regional Rail Reorganization Act of 1973, implementation of the proposed Memorandum of Understanding with SEPTA is no longer feasible. The Trustees' petition to withdraw their previous petition for approval of the Memorandum of Understanding should be granted.

■ 2. Unless the payments contemplated by the interim agreement previously approved by this Court are paid promptly, the Trustees should proceed forthwith with the necessary steps to terminate commuter rail operations in the Philadelphia area.

3. On the assumption that the interim payments are made current and are kept current, the Trustees should proceed forthwith to negotiate with SEPTA, National Rail Association, Amtrak, and other interested governmental agencies for a permanent solution to the problems of commuter operations in the Philadelphia area. If the Trustees of the Debtor are to continue to provide commuter rail service, it must be on a basis which provides reimbursement of fully allocated costs, plus a fair return on the value of the properties devoted to such service. If property of the Debtor is to be conveyed or otherwise transferred to others for use in providing commuter service, the Debtor's estate must receive just compensation therefor.

## ORDER NO. 1507

And now, this 18th day of March, 1974, it is ordered:

1. The "Petition of the Trustees for Approval of Memorandum of Understanding with SEPTA" (Document No. 5442) is marked "WITHDRAWN."

2. The Trustees shall report to this Court, not later than March 27, 1974, the status of payments due from SEPTA covering commuter operations since July 1, 1973.

3. Unless the Trustees are able to report by March 27, 1974, that all payments due from SEPTA for said interim operations have been brought up to date, the Trustees shall, not later than April 1, 1974, file a further report outlining a program for prompt termination of the service involved.

4. The Trustees are directed to report, not later than April 8, 1974, the status of negotiations for a permanent solution to the problems of recurring losses on the Philadelphia area commuter service.