■ In the Matter of the TOWN OF HEMPSTEAD, Respondent, Relative to Acquiring Title to Real Property for Park Purposes at Point Lookout in the Vicinity of Sea Spray Drive East in the Town of Hempstead. (Matter No. 1.) In the Matter of the TOWN OF HEMPSTEAD, Respondent, Relative to Acquiring Title to Real Property for Park Purposes near Point Lookout Malibu in the Town of Hempstead. (Matter No. 2.) MALIBU ASSOCIATES, INC., Appellant; OVIDE E. DE ST. AUBIN et al., Respondents. — In condemnation proceedings, claimant Malibu Associates, Inc., appeals, as limited by its brief

and on the ground of inadequacy, from so much of a partial final decree of the Supreme Court, Nassau County, dated May 2, 1979, as awarded compensation for the improvements on the condemned realty. Decree reversed insofar as appealed from, on the law, with costs payable jointly by respondents appearing separately and filing separate briefs, and the matter is remitted to Special Term for further proceedings in accordance herewith. In 1954, appellant leased some 36½ acres of beachfront property on the south shore of Long Island from Ovide de St. Aubin and and Manlio Liccione. (Liccione divested himself of his interest in the property prior to this proceeding.) The parties stipulated that their respective interests in the improvements in the property, in the event of condemnation, would be 71.7% to appellant and 28.3% to St. Aubin. These figures were reversed with respect to their respective interests in the land itself. Appellant constructed on the property a large clubhouse for catering, cabanas, lockers, swimming pools, tennis, handball and basketball courts, and other facilities, at a cost of $2.5 million. The business operation of these facilities was a failure, however, and in 1968, at which time the beach club facilities had a stipulated depreciated value of $1.38 million, the facilities were condemned by the respondent town. From the time of condemnation until the present, the town operated the premises, as had appellant, as catering and recreational facilities. Indeed, the town has not made any substantial structural changes in the improvements on the property. In 1977 it realized an income of approximately $400,000 from the operation of the facilities. Special Term found that the highest and best use of the condemned property would be single-family residential use, and thus denied compensation for the reproduction value of the beach club facilities, in that they interfered with the highest and best use of the property. We conclude that this ruling was error. There is substantial support for the proposition that the value of improvements which interfere with the judicially determined best use of condemned property, and which consequently must be destroyed, is not compensable (see *Van Kleeck v State of New York*, 18 NY2d 897; *Matter of County of Nassau [Colony Beach Club of Lido]*, 43 AD2d 45, affd 39 NY2d 958; *Irv-Ceil Realty Corp. v State of New York*, 43 AD2d 775; *Spano v State of New York*, 22 AD2d 757). However, this case is manifestly different. Not only did the improvements not have to be destroyed, but they were actually utilized by the town in connection with the use to which it put the property. Under circumstances such as these, where improvements inconsistent with the best use of the land are nonetheless utilized by the condemnor for the purpose for which they had been erected, the value of the improvements must be compensated (see *Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.]*, 20 NY2d 457, remittitur amd 20 NY2d 968, cert den 390 US 1002; *Matter of City of New York [New Gen. Hosp. — Cinelli]*, 280 App Div 196, affd 305 NY 835; *City of New York v State of New York*, 49 AD2d 659). It would be both irrational and unfair for the town to use the beach club structures for the same purposes as did appellant, and yet not compensate it for the structures because they are inconsistent with the best use of the land. Consequently, the town should compensate appellant for the reasonable reproduction value, less depreciation, of the structures, such sum to be determined after a hearing. Hopkins, J.P., Gibbons and Weinstein, JJ., concur.

Lazer, J., dissents and votes to affirm the decree insofar as appealed from, with the following memorandum: I do not agree, as my colleagues apparently have posited, that a condemning authority which intends to put the property it takes to the same use as the owner did must pay for it on a

summation basis at the condemnee's option. The controversy here concerns not only the total amount of the award for the taking of a parcel known as the Malibu Beach and Cabana Club, but also how the award should have been arrived at. The property consists of 36.413 acres in the "Lido strip" between Lido Boulevard and the Atlantic Ocean in Lido Beach, Nassau County, with 800 feet of frontage on the ocean and 750 on Lido Boulevard. When the Town of Hempstead took the property in 1968, it was improved with six one-family dwellings, 428 cabanas, 212 lockers, a clubhouse with catering facilities, snackbars, tennis and handball courts, swimming and wading pools, parking areas and other related facilities. Although the town's continued use of the property as a beach and cabana club is the focus of the attack on the award, the events of the 14 years before the taking are at least as pertinent. In 1954 Malibu Associates, Inc. (Malibu) entered into a 21-year lease with two 21-year renewal options with the owners, Ovide de St. Aubin and Manlio Liccione, who have since divested themselves of their interest in the property. During the mid-1950's, Malibu and five other clubs in the area constructed beach and cabana club facilities. For 14 years, until the property was taken in 1968, Malibu or its subsidiaries operated a beach and cabana club on the premises, during which time Malibu also became the fee owner of a portion of the land. Since both the fee and leasehold interests were extinguished by the condemnation, Malibu and St. Aubin simplified adjudication of the conflict between their interests by agreeing that Malibu's interest in the land was 28.3% while its interest in the improvements was 71.7% with St. Aubin's interests the converse. The obvious consequence of the agreement was that an award which fixed a high improvement value would benefit Malibu, which had constructed the club facilities, while high land value was to St. Aubin's advantage. To accommodate this stipulation, the claimants requested the court to allocate its award to indicate separately the value of the land and the improvements. Malibu now attacks the allocations and the total amount awarded; St. Aubin defends both. At the trial, the appraisers produced by the three parties to the proceeding and Malibu's engineer agreed that the beach club improvements were more costly and extensive than those of the neighboring operations and were capable of continued use for the purpose for which they had been constructed. Nevertheless, the record establishes that Malibu's operation was a consistent financial failure. In 1961 Malibu and its operating subsidiary underwent a chapter 11 bankruptcy proceeding, and in 1966 and 1967, the final two years before the taking, the losses incurred were $236,387.74 and $228,562.27, respectively. Malibu neither claimed going concern value nor that the property was a specialty for which the summation method of valuation should be utilized, asserting that the business losses did not reflect upon the income producing capacity of the improvements but only upon the failure of a particular business operation. The parties agreed that the sound value of the improvements at vesting date (apart from the six residential structures) was $1,380,000, a sum which represents the reproduction cost of the improvements less physical and functional obsolescence and 5% for economic obsolescence. St. Aubin and the town reserved the right to demonstrate greater economic obsolescence as well as the claimed irrelevancy of the sound value, but by the time the trial ended they had tendered no further proof on the issue. The paramount question at Special Term was the highest and best use applicable to the property. The town and St. Aubin contended that single-family residential development constituted the highest and best use and that the property therefore should be valued as acreage with an increment for potential development. The experts who supported

this view asserted that Malibu's 14-year history (as well as that of the neighboring clubs) demonstrated that the beach and cabana club improvements were not economically feasible. One major consequence of these conclusions as to highest and best use was to render the beach club improvements inconsistent with such residential use so that they became valueless. Indeed, residential development would have required removal of the beach club improvements at substantial expense. Malibu argued that profitability is not the primary test of highest and best use since the definition of such use must include consideration of community environment and the fact that the improvements continued to be utilized for the benefit of the town once they were taken established their importance to the community. Since no comparable sales of beach club properties existed and no income approach to value was employed, Malibu contended that summation was the appropriate method of ascertaining the value of the property. Its expert added the $1,380,000 sound value of the beach club improvements, the $175,000 he estimated as the value of the residences on the property, and $35,000 per acre for the land, and arrived at $2,850,000 as the total award to be apportioned according to the allocation formula. Special Term decided that the highest and best use of the property was for the development of single-family dwellings, and that the beach club improvements could not be allocated any value because they impeded the residential use. Relying on comparable acreage sales, the court valued the land at $59,000 per acre for a total of $2,148,367 and the six dwellings at $175,000. Of the resulting "rounded" award of $2,323,000, Malibu's allocated share of the total seems to be only $733,460 and it attacks both the methodology relied upon and the total valuation found. My colleagues have accepted Malibu's contention that the town's continued use of the property compels its valuation by summation criteria and they would reverse and return the matter to Special Term for further consideration. I would affirm. Where private property is taken for public use, the Fifth Amendment requires that the owner be awarded just compensation, " 'just' both to an owner whose property is taken and to the public that must pay the bill" *(United States v Commodities Corp.,* 339 US 121, 123; *Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.],* 20 NY2d 457, 470, remittitur amd 20 NY2d 968, cert den 390 US 1002; see *Searl v School Dist., Lake County,* 133 US 553; *Matter of City of New York [Friedman],* 24 AD2d 243; *United States v One Parcel of Land,* 131 F Supp 443; 3 Nichols, Eminent Domain [3d ed], § 8.6, par [1]). Although in the past, fair market value has been equated with just compensation, it is not a magical formula (see, e.g., *Keator v State of New York,* 23 NY2d 337; *Matter of Board of Water Supply of City of N. Y.,* 277 NY 452) to be dogmatically followed. Fair market value has been defined as the amount of money which a purchaser willing but not obligated to buy the property would pay to an owner willing but not obliged to sell it, considering all uses for which the land was suited *(United States v Miller,* 317 US 369; *People ex rel. City of New York v Lyon,* 114 App Div 583, affd 186 NY 545; *City of Syracuse v Stacey,* 45 App Div 249, affd 169 NY 231; 4 Nichols, Eminent Domain [3d ed], § 12.2, par [1]; see *Matter of Board of Water Supply of City of N. Y., supra).* Fairness to the condemnee generally requires that valuation be at the highest and best available use for the property *(Matter of City of New York [Shorefront High School — Rudnick],* 25 NY2d 146, remittitur amd 26 NY2d 748; *Keator v State of New York, supra; Sparkhill Realty Corp. v State of New York,* 254 App Div 78, affd 279 NY 656; *Matter of City of Rochester [Smith St. Bridge],* 234 App Div 538; 4 Nichols, Eminent Domain [3d ed], § 12.314). There are a number of recognized techniques for

ascertaining fair market value at the highest and best use. These include the "market data" approach generally involving proof of comparable sales *(Matter of City of New York [Shorefront High School — Rudnick], supra; Samuelson v Salamanca Urban Renewal Agency,* 34 AD2d 369; *Matter of City of New York [Lincoln Sq. Slum Clearance Project],* 15 AD2d 153, affd 12 NY2d 1086), the economic approach, generally accomplished by capitalizing net income *(Humble Oil & Refining Co. v State of New York,* 12 NY2d 861; *Motsiff v State of New York,* 32 AD2d 729, affd 26 NY2d 692; *Matter of City of New York [De Nigris — De Nigris Realty Corp.],* 20 AD2d 42; see *Matter of City of New York [Ocean View Terrace],* 42 NY2d 948), and summation, by which the value of the land is added to the reproduction cost of the improvements to reach a total which is reduced by the amount by which the improvements have depreciated *(Matter of City of New York [Blackwell's Is. Bridge],* 198 NY 84; *Matter of County of Nassau [Colony Beach Club of Lido],* 43 AD2d 45, affd 39 NY2d 958; *Keator v State of New York,* 23 NY2d 337, *supra; Samuelson v Salamanca Urban Renewal Agency, supra;* 4 Nichols, Eminent Domain [3d ed], § 12.32, par [3], cl [b]). The reproduction cost approach generally is employed where the property is a specialty, i.e., the improvements were designed to be of special use to the owner, no ready market for the property exists, the improvements are appropriate (economically feasible) and would likely be replaced if the property was taken *(Matter of County of Nassau [Colony Beach Club of Lido],* 43 AD2d 45, 49, *supra).* In *Matter of County of Nassau (Colony Beach Club of Lido) (supra),* which involved Nassau County's taking of two neighboring beach clubs in the Lido strip, this court determined that those clubs did not qualify for treatment as specialties because their improvements were no longer appropriate since they were not economically feasible and there was no reasonable expectation that they would be replaced. The question of whether, under other circumstances, beach and cabana club improvements can be deemed specialties was never adjudicated. Nor need we reach that question now for Malibu does not argue that its club improvements and use rendered the property a specialty. As has been noted, it urges instead that the recreation, catering and beach club use to which the property was put was the highest and best use and that it was essential to the public. Malibu asserts that the property should be valued for its "inherent value" for public use and asks that compensation be fixed at sound value due to the town's continued use of the improvements for the same purposes for which they were built and used by the condemnee. Principles of justice and equity require us to use a degree of flexibility in employing standards to ascertain just compensation. "Fair market value has normally been accepted as a just standard. But when the market value has been too difficult to find, or when its application would result in manifest injustice to the owner or public, courts have fashioned and applied other standards" *(United States v Commodities Corp.,* 339 US 121, 123, *supra; United States v Virginia Elec. Co.,* 365 US 624; *Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.],* 20 NY2d 457, 468, *supra).* We may, therefore, fashion other standards, but we should do so only to prevent manifest injustice. The standard Malibu asks us to apply in this case is compensation based on what the taker has gained. "One of the most confusing aspects of the theory of valuation under the law of eminent domain is that presented by the problem of value to the taker" (1 Orgel, Valuation Under Eminent Domain [2d ed], p 351). Although Justice Holmes specifically rejected value to the taker as the standard of just compensation *(Boston Chamber of Commerce v City of Boston,* 217 US 189; *McGovern v City of New York,* 229 US 363; *City of New York v*

*Sage,* 239 US 57) and the fundamental question continues to be "what the owner has lost, not what the taker has gained" *(Fonda, Johnstown & Gloversville R.R. Co. v State of New York,* 29 AD2d 240, 241), the problem of the justness of compensation persists. There are significant holdings to the effect that even if a property has no market value and cannot be treated as a specialty, if it has a usefulness which was created by the condemnee and the condemnor intends to continue putting the property to the same use, it is unjust to call the improvement worthless and to set compensation at scrap value *(Matter of Port Auth. Trans-Hudson Corp., supra* [PATH]; see, e.g., *Matter of City of New York [New Gen. Hosp. — Cinelli,],* 280 App Div 196, affd 305 NY 835). The PATH case involved the condemnation of the Hudson Tubes and the controversy principally concerned the compensation to be set for the Hudson River tunnels. In 1911 these tunnels had cost $32,000,000 to construct (see *Matter of Port Auth. Trans-Hudson Corp., supra,* pp 464, 470) but by the time of condemnation reproduction would have cost over $400,000,000 (p 470). But times had changed since 1911, and 50 years after its operations had begun, the Hudson Rapid Tubes Corp. was compelled to reorganize under the Bankruptcy Act (p 464). It continued to suffer financial setbacks and ultimately its property was condemned in order to continue an essential public facility which might otherwise have ceased functioning. With no basis by which to ascertain the market value of the railroad itself, the Appellate Division reversed Special Term's award of $55,000,000 and fixed compensation at $3,500,000, of which $1,700,000 represented the value of railroad cars, $500,000 working capital, and $1,300,000 the estimated value of the tunnels and other railroad property. The Court of Appeals disagreed, finding that the scrap value award of "virtually nothing" for tunnels which initially cost $32,000,000 and which would have cost $400,000,000 to reproduce at the time of condemnation constituted an egregious violation of justice, particularly since the condemnor intended to continue to use the facility (pp 467-471). Accordingly, it awarded the condemnee $30,000,000, the depreciated original cost of the tunnels (p 471). Since there can be little genuine connection between this original expenditure made more than a half century prior to the condemnation and the value of the tunnels when condemned, the figure awarded has no cognizable relationship with any recognizable standard of real property valuation. PATH represents a strong judicial reaction to palpable injustice, but it provides precious little guidance for resolution of other "manifest injustice" situations. In my view, the Malibu award represents sound disposition of a three-way dispute. Although the total of the award will change if Malibu's contentions are adopted, the primary controversy is really between landlord and tenant and its resolution at Special Term does not constitute a manifest injustice which we should cure by fashioning a different remedy. In 1968, Malibu was not the sole owner of the land and improvements which comprised the beach club; indeed, it owned a little more than a quarter of the fee, the rest being leased from St. Aubin. When the property was taken, Malibu's lease had but seven years to run, although two 21-year renewal options were available to it. Considering Malibu's dismal record of financial failure, the likelihood that the options would have been exercised seems quite slim. Since title to the improvements was to vest in the owner at the expiration of the lease, the greatest prospect is that St. Aubin was seven years from acquiring most of the beach club improvements when the town decided to extinguish all private interests in the property. Where there are two or more interests in a condemned parcel, the proper mode of assessing damages is to ascertain first the damage to the fee as if it were unen-

cumbered and then apportion that amount among all the interests which are held in the property *(Great Atlantic & Pacific Tea Co. v State of New York,* 22 NY2d 75). The damages to which a lessee is entitled are generally the value of the leasehold *(Matter of City of New York [Delancey St.],* 120 App Div 700), and a lessee who has made improvements to property which are to pass to the landlord upon expiration of the lease, is entitled to have the value of those improvements become an item of value to be considered to the extent they have enhanced the market value of the leasehold *(Matter of City of New York [Fairfield County Trust Co.],* 19 AD2d 44; *Carlock v United States,* 53 F2d 926). The traditional method of valuing a leasehold is to award the difference between the rental value of the leasehold for the unexpired portion of the term and the rent reserved for that period *(Matter of City of New York [Fairfield County Trust Co.], supra; Matter of City of New York [Delancey St.], supra).* In that connection, the lessee's right to renew affects the value of the leasehold and it must be considered *(Great Atlantic & Pacific Tea Co. v State of New York, supra;* 4 Nichols, Eminent Domain [3d ed], § 12.42, par [3]). Here, the usual considerations relative to apportionment over which owners and lessees frequently debate were supplemented by an agreement by which the landlord and tenant fixed their respective percentage entitlements to the components of the award. The agreement does not, however, dispose of the threshold question as to what standard of valuation should be applied in appraising those components, and it sheds no light on the question of manifest injustice. In my view, manifest injustice analysis in a case such as this cannot proceed without reliance on traditional criteria to ascertain the value of the leasehold itself. Malibu certainly was deprived of the improvements for the seven unexpired years of the lease, but my strong doubt that the lease ever would have been renewed inclines me toward the belief that no manifest injustice resulted either from the Special Term's reliance upon the highest and best use approach or from its award by which Malibu became entitled to more than $730,000 for its interest in the fee and leasehold, including the right to use the improvements for a financially failing operation for another seven years. Application of the summation method to the instant taking would reward Malibu for what the record clearly indicates was an improvident investment. Summation is a method by which society attempts to provide just compensation where other conventional valuation standards shed insufficient light on value because the property taken is a specialty. But in its effort to be just to propertied interests, the judicial system has been careful to be fair as well to the public by establishing as criteria for specialty status the financial validity of the investment made and the likelihood that the use will be reproduced elsewhere if the property is taken. These standards represent not merely the technical rationalizations of appraisal sophisticates — they are clearly intended to avoid rewarding those whose poor investment judgment has resulted in the construction or purchase of improvements unsuited to the land, ill chosen from the point of view of financial return, and unlikely to be reproduced elsewhere. Moreover, and apart from their application to uses that can be classified as specialties, reproduction costs are disfavored as a method of valuation because of their inherently inflationary attributes (see *United States v Benning Housing Corp.,* 276 F2d 248). Since the cost approach "among other things, ignores entirely factors like functional obsolescence, [it] is useful principally, apart from specialties, to set a ceiling on valuation" *(G.R.F., Inc. v Board of Assessors of County of Nassau,* 41 NY2d 512, 514). The reason, of course, is that no improvement is worth more than replacement cost less depreciation. If property taken to be put to

the same use as that of the owner must always be paid for on a reproduction cost basis at the condemnee's option, the prime beneficiaries will likely be those who have invested so poorly and whose improvements are so inappropriate to the land so as not to reflect highest and best use. Such improvident entrepreneurs will be in the position of receiving awards which reflect no discount for the fact that the market values of their properties have been limited by the poor judgment underlying the construction of specific improvements. Instead — in this inflationary age — the public need for their property will reward them with the current costs of reproduction, less depreciation, for improvements which either should not have been made in the first place or which should not have been purchased after construction. Furthermore, since justice must then dictate that we offer the same benefits of the cost approach to those who have invested wisely, wise and unwise alike can reap from the public fisc a return never merited in the private marketplace. My conclusion, then, is that Special Term did not err, and I dissent and vote to affirm.