**In the Matter of the VALUATION PRO-
CEEDINGS UNDER §§ 303(c) AND 306
OF THE REGIONAL RAIL REORGA-
NIZATION ACT.**

**Misc. No. 76–1.**

Special Court, Regional Rail
Reorganization Act.

Argued Sept. 27, 1976.

Decided Oct. 18, 1976.

Edwin M. Zimmerman, Washington, D.C. (David B. Isbell, William D. Iverson, Stuart C. Stock, and Covington & Burling, Washington, D.C., Paul R. Duke, and John B. Rossi, Philadelphia, Pa., of counsel), for Penn Central Trustees and Certain Affiliated Transferors.

Louis A. Craco, New York City (Walter H. Brown, Jr., Thomas L. Bryan, Rebecca T. Halbrook, Richard L. Posen, Michael B. Targoff, and Willkie, Farr & Gallagher, New York City, Frederic L. Ballard, Sr., and Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel), for Intervening Penn Central Lienholders.

Stanley Weiss, Newark, N.J. (M. Elaine Jacoby, Dean R. May, and Carpenter, Bennett & Morrissey, Newark, N.J., of counsel), for Trustee of the Central Railroad Co. of New Jersey.

Morris Raker, Boston, Mass. (Joseph Auerbach, Thomas W. Armstrong, Harvey E. Bines, Thomas D. Halket, and Sullivan & Worcester, Boston, Mass., James Wm. Moore, New Haven, Conn., of counsel), for Trustee of The New York, New Haven and Hartford Railroad Co.

Howard H. Lewis, Philadelphia, Pa. (James A. Sox, Jeffrey B. Rotwitt, and Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., Lockwood W. Fogg, Jr., Plymouth Meeting, Pa., of counsel), for Trustees of the Reading Co. and for Its Wholly-Owned Subsidiaries.

Charles I. Thompson, Jr., Philadelphia, Pa., for the North Pennsylvania R. Co., The Delaware and Bound Brook R. Co., Philadelphia, Germantown and Norristown R. Co., and Plymouth R. Co.

Jerome K. Walsh, New York City (Walsh & Frisch, New York City, Joseph J. Connolly, William H. Ewing, and Goodman & Ewing, Philadelphia, Pa., Herbert G. Schick, Mark Willcox, Jr., and Hepburn, Ross, Willcox & Putnam, Philadelphia, Pa., of counsel), for Secondary Debtors of The Penn Central Transportation Co.

Stephen Schachman, Philadelphia, Pa. (Alan C. Kauffman, and Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., of counsel), for the Peoria and Eastern Railway Co.

William R. Traub, David C. Toomey, Jared I. Roberts, and Duane, Morris & Heckscher, Philadelphia, Pa., for Trustee of the Lehigh Valley R. Co.

Harry G. Silleck, Jr., John L. Altieri, Jr., and Mudge, Rose, Guthrie & Alexander, New York City, for Trustees of Erie Lackawanna Railway Co., and Certain Affiliated Non-Bankrupts.

Joseph J. Connolly, and Goodman & Ewing, Philadelphia, Pa., for Little Miami R. Co., and Ft. Wayne and Jackson R. Co.

Frank Buckhout McShane, and Walsh & Frisch, New York City, for The Mahoning Coal R. Co.

Steven R. Gross, Michael Patterson, and Debevoise, Plimpton, Lyons & Gates, New York City, Edward I. Dobin, and Curtin & Heefner, Morrisville, Pa., for Trustees for Pennsylvania Tunnel and Terminal R. Co., and Trustee for The New York Connecting R. Co.

Joseph S. Radom, and Thomas B. Radom, Detroit, Mich., for Trustee of the Ann Arbor R. Co.

Edmund J. Kenny, James E. Hussey, and Winston & Strawn, Chicago, Ill., for Trustee of the Chicago River and Indiana R. Co.

Perrin C. Hamilton, Philadelphia, Pa., for the East Pennsylvania R. Co.

Earl J. Krock, and Burgess, Fullmer, Parker, Steck & Andrews, Cleveland, Ohio, for The Kalamazoo, Allegan & Grand Rapids R. Co.

Timothy V. Smith, New York City, for Trustee of The Lehigh and Hudson River Railway Co.

George F. Galland, Robert W. Ginnane, and Galland, Kharasch, Calkins & Brown, Washington, D.C., for Norwich & Worcester R. Co.

Lloyd N. Cutler, William R. Perlik, Louis R. Cohen, Washington, D.C. (William T. Lake, Cary B. Lerman, David R. Johnson, Edward T. Hand, and Wilmer, Cutler & Pickering, Washington, D.C., Kevin P. Charles, Robert H. Kapp, Howard R. Moskof, George W. Mayo, Jr., and Hogan & Hartson, Washington, D.C., Cary W. Dickieson, Gen. Counsel, Stephen C. Rogers, Asst. Gen. Counsel, and Jordan Jay Hillman, Sp. Counsel, United States Railway Ass'n, Washington, D.C., of counsel), for United States Railway Assn.

Rex E. Lee, Asst. Atty. Gen., Paul M. Tschirhart, and John H. Broadley, Dept. of Justice, Washington, D.C., Donald T. Bliss, Jr., Deputy Gen. Counsel, Alexander P. Humphrey, Justine Fischer, Philip J. Ward, and James I. Singer, U.S. Dept. of Transp., Washington, D.C., for United States of America.

John G. Harkins, Jr., Laurence Z. Shiekman, and Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

OPINION WITH RESPECT TO ISSUES SET FOR BRIEFING AND ARGUMENT AS SUBJECTS (1) AND (2) OF SCHEDULE ATTACHED TO MEMORANDUM AND ORDER OF JUNE 16, 1976

FRIENDLY, Presiding Judge:

In our Memorandum and Order of June 16, 1976 (hereafter "June 16 Memorandum"), a copy of which is appended to this opinion as an addendum, issued after we had received statements of position from the parties and answers thereto, we sought to identify certain issues of principle early determination of which by this Court would enable us to frame appropriate instructions to the special masters who will take detailed evidence. Opening briefs on various subjects were due by August 23, with answering briefs to be filed on September 21. Oral argument was heard on September 27. In this opinion we deal with most of these subjects, although, as anticipated in the June 16 Memorandum, we find that an attempt at resolution of some would be premature.

## I. *"Public Interest."*

■ Section 303(c)(1)(A) of the Rail Act directs that after the transfers and conveyances of the properties designated in the FSP, this Court "giving due consideration to the findings contained in the final system plan" shall determine, among other things, whether such transfers or conveyances "are in the public interest". We raised the question what our responsibilities

in making that determination could be since a number of provisions of the Act and materials in the legislative history indicated that we were not to pass generally on the merits of the FSP from a transportation standpoint,[1] a task performed initially by USRA and later in some degree by Congress itself, and also because any large scale reconveyance would be impracticable.

Most of the parties, evidently sharing our inability to discern what Congress expected of us, have advanced no suggestions on this. The EL Trustees suggest that the "public interest" clause might require us to consider the viability of ConRail at the time when it becomes necessary to distribute the Series B Preferred Stock and the common stock, whose fair market value is deductible from the base value of the certificates of value, § 306(c).[2] We are not greatly impressed by the argument but we need not deal with it at this time since the date of the distribution unhappily is far in the future.

The Trustees of the Reading suggest that the "public interest" requirement compels us to pass on contentions that the designations of certain property do not meet that criterion. They cite as examples the designation of Reading's 3,000 shares (all the capital stock) of the Washington & Franklin Railway Company, which is leased to the Western Maryland Railroad Company, a Chessie System subsidiary, under a 995-year lease running from July 1, 1901, and Reading's 500 shares of stock in the Trailer Train Company. The First National Bank of Chicago, as Trustee under the First Mortgage Indenture of The Chicago River and Indiana Railroad Company, raises a somewhat similar question with respect to the Ashland Avenue yard in Chicago.[3] Fi-

---

1. *See* Regional Rail Reorganization Act of 1973, *as amended*, § 209(a) second sentence; Report of the Committee of Conference on S. 2718, H.R.Rep.No.781, 94th Cong., 2d Sess. 187–88 (1976).

2. A similar suggestion is made by the Trustee of the Central Railroad Company of New Jersey, and by the Intervening Penn Central Lienholders. *Cf.* opening brief of the Trustee of the

Lehigh Valley Railroad Company; brief of the Trustee of the Lehigh and Hudson River Railway Company.

3. The FSP, Vol. I, p. 262, limited the designation to the portion of the yard "needed to sustain ConRail operations." The Bank contends that the portion ordered to be conveyed was in excess of this.

nally, the North Pennsylvania Railroad Company, the Delaware and Bound Brook Railroad Company, the Philadelphia, Germantown and Norristown Railroad Company, and the Plymouth Railroad Company, question whether two properties—one belonging to the Bound Brook and allegedly without rail use, and the other consisting of various overhead utility wire rental agreements—were properly designated.

Although we are cognizant of the arguments, based particularly on the final sentence of § 208(d)(2), on § 208(d)(3)(C), and on the final sentence of § 209(e)(1), that may be made against such review, we are not disposed to rule out the latter without further briefing. Contentions that particular transfers were not "in the public interest" raise some of the same questions as contentions, raised at an earlier stage of the proceedings before us, that certain designations were not of "rail properties" as defined in § 102(12). It is highly desirable that if any transfers or conveyances are to *be annulled as not in the public interest or as unauthorized, this should be determined before time and effort are expended in valuing them.* We therefore direct that any claims that transfers or conveyances were not in the public interest or were unauthorized be filed, *in the form of complaints in separately numbered actions,* not later than December 1, 1976, and order that any claims not so filed will be deemed to have been waived. Notice of this direction will be promptly mailed by the Court's executive attorney to counsel for all transferors who appeared in the transfer proceedings, Misc. No. 75–3. We, of course, encourage the parties to endeavor promptly to settle any disputes of this sort; an appendix to the answering brief of the Government parties indicates that such efforts are in progress with respect to several of the properties we have mentioned.

Save to the extent here indicated, we shall instruct the special masters not to give

further consideration to the "public interest" criterion of § 303(c)(1)(A) insofar as it relates to setting a standard of valuation unless a party makes a specific and supported request to that end, showing that a different result would ensue from application of the criterion, in which event the master shall seek this Court's further instructions.

II. *"Fair and Equitable."*

Section 303(c)(1)(A) also requires us to make a finding, subsequent to the transfers and conveyances, that these

> are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization or a step in such a plan under section 77 of the Bankruptcy Act (11 U.S.C. 205), or fair and equitable to a railroad that is not itself in reorganization but which is leased, operated, or controlled by a railroad in reorganization
>
> . . . .

In the June 16 Memorandum we expressed doubt whether these words, generally used in corporate reorganization law to deal with the distribution of the securities of a reorganized company among various classes of creditors and stockholders, had any practical application to the valuation of the properties "in view of the facts (a) that if the consideration is 'fairer and more equitable than is required as a constitutional minimum,' § 303(c)(3) requires us to eliminate the excess, and (b) that if the consideration were less than the constitutional minimum, it would not be fair and equitable."

Here again most of the parties share our inability to discern why, under the terms of the Rail Act, the requirement that we find that the consideration is more than, less than, or equal to the "constitutional minimum" does not drain the "fair and equitable" language of all meaning as regards the adequacy of the total consideration to be received by each transferor.[4] Accordingly

---

4. As noted in the *June 16 Memorandum,* 425 F.Supp. at 279, the Government parties suggest that fairness and equity might entitle

transferors of particularly strategic properties to larger allocations of ConRail Series B Preferred and common stock, which would give

we propose to instruct the special masters that in valuing the properties they need not address themselves to the fair and equitable standard as distinguished from the constitutional minimum in the absence of a specific and supported claim that a different result would ensue from application of such a standard, in which event the master shall seek this Court's further instructions.

### III. *Reorganization vs. eminent domain statute.*

In the June 16 Memorandum we requested the parties to brief the question "whether the standard of valuation should be different if the Act be regarded as a reorganization statute, as an eminent domain statute or as both." 425 F.Supp. at 280 (footnote omitted). The question how far the Rail Act is a "reorganization statute" and how far it is an exercise of eminent domain was considered by this Court in *In the Matter of Penn Central Transportation Company*, 384 F.Supp. 895, 926–38, 948–52 (Sp.Ct. R.R.R.A.1974) (sometimes hereafter "our 1974 decision"), and, more importantly, by the Supreme Court in *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 148–55, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

In light of the briefs and argument, we now have some doubt whether the question we put in our June 16 Memorandum was precisely the right one. Perhaps the question could be more accurately stated as being whether the Act involves a taking and, if so, whether the "constitutional minimum" required both by the terms of the Act and by the Fifth Amendment differs if the Act should be regarded as a reorganization statute enacted under the bankruptcy power or as a statute enacted under the commerce power or as both.

The transferors and creditor and stockholder interests argue that the Rail Act is a taking within such cases as *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d

1554 (1960), and that the constitutional minimum must, therefore, be a figure established in light of the body of case law relating to eminent domain, of which they regard the decision in *In the Matter of the Port Authority Trans-Hudson Corp.*, 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967), *cert. denied*, 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 (1968), as a significant example. They would dispose of the Supreme Court's indication, 419 U.S. at 155, 95 S.Ct. 335, that the only taking is of the "shortfall" between the constitutional minimum and the value of the compensation provided under the Act on the basis that this formulation requires judicial determination of what constitutes a constitutional minimum and that the process of determining the amount of any "shortfall" thus is no different than if the entire property were taken. In other words, they regard the Court's emphasis on the Act's being a valid exercise of the bankruptcy power and thus a reorganization statute, 419 U.S. at 153, 95 S.Ct. 335, as being a basis for upholding the validity of the Act without the Court's being obliged to decide whether compensation other than money may be adequate under what is solely a condemnation statute, see 419 U.S. at 149–55, 95 S.Ct. 335, rather than as implying that the constitutional minimum would be different than if the Rail Act had been enacted solely under the commerce power.

The Government parties point to other arguments which look the other way. They cite this Court's statement, 384 F.Supp. at 927, that Congress did not have to choose between "the Scylla of outright condemnation and subsequent nationalization and the Charybdis of a collapse of rail transportation in the most heavily industrialized section of the country"; they argue from this that we did not believe that the Rail Act constituted "outright condemnation." They refer also to the Supreme Court's statement, 419 U.S. at 152–53, 95 S.Ct. [335] at 363 where in answer to a contention that the Rail Act's provisions "for a compelled

them a larger share in the envisioned future prosperity of ConRail. This issue is a long way

off and we need not consider it now.

conveyance and for the continuation of rail services pending formulation of the Final System Plan constitute the Act a condemnation statute", the Court found "no significance in these features of the Act" since "Congress, in enacting those provisions, clearly intended to legislate pursuant to the bankruptcy power", and followed this up with a reference to *RFC v. Denver & R. G. W. R. Co.*, 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946), "where the Court sustained the 'cram-down' provision of § 77 authorizing a reorganization court to confirm a plan despite its rejection by creditors." Stressing the creditors' and stockholders' continued ownership in the assets conveyed to ConRail by virtue of the distribution of the Series B Preferred and common stock to the transferors, the Government parties argue that if Congress had simply authorized or directed a reorganization court to carve out the most productive elements of a bankrupt railroad and transfer them to a new corporation in exchange for its securities, this would have come within traditional reorganization concepts and that no different result is required because the Rail Act dealt with the assets of a number of primary and secondary bankrupts and even of nonbankrupts whose properties were leased or controlled by bankrupts. See in this connection the discussion at 384 F.Supp. at 951–52. The upshot of the contention of the Government parties is that the constitutional minimum for the properties transferred should be determined solely by reference to the value of realistic choices of which the Rail Act deprived the transferors, rather than under principles of condemnation law if the latter should in fact be different, which they deny.

In light of our conclusion that determination both of net liquidation value and of the constitutional minimum requires consideration of evidence showing significant likelihood of sales for rail use, it is difficult at this point to appraise exactly how much may ride upon the difference between these views. It is clear, however, that the amount may be substantial. In the light of the extensive and helpful briefing and argument, it now appears to us that a decision as between the respective positions at this time might significantly impinge upon our determination of constitutional minimum value discussed in Part V of our June 16 Memorandum which we set for more detailed briefing in early 1977. Accordingly, we conclude that it is not desirable at this time to answer the question put in Part II(3) of our June 16 Memorandum, as put or as here recast, and that we should defer decision until we have received the briefs therein specified and heard further argument.

IV. *Sales to public bodies for rail use— and herein of "net liquidation value."*

■ In the June 16 Memorandum, 425 F.Supp. at 283, we posed the following question:

> Assuming that in determining "net liquidation value" as used in § 306(c)(4) the Court should take account of a higher price obtainable for certain properties on a sale for rail use rather than, as USRA proposed, "at the pricing levels which would obtain if all rail operations over the lines of the bankrupts actually ceased and as if the assets of the railroads in reorganization actually were dismantled and disposed of for other uses" (FSP, Vol. I, p. 125), should the Court do this when the proposed sale is to a public body vested with the power of eminent domain, in the absence of proof of a private purchaser ready and willing to make the purchase?

For the reasons indicated below, the submissions convince us that the transferors should be left free to develop the significant likelihood of such sales and the prices expectable therefrom, following the procedures outlined in our June 16 Memorandum, 425 F.Supp. at 283.

The Government parties argue strenuously for a negative answer to the question posed. They rely heavily on the point that sale to a public body even for rail use would constitute an abandonment requiring a cer-

tificate from the Interstate Commerce Commission under § 1(18) of the Interstate Commerce Act; that § 1(20) authorizes the Commission to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require"; and that the Commission frequently includes as a condition a "salvage value clause." This typically reads:

> [T]he applicant [shall] sell the branch or any part thereof, to any person or persons offering . . . to purchase the same for continued operation at a price not less than the net salvage value thereof.

*Texas & N. O. R.R. Abandonment,* 282 I.C.C. 1, 13 (1951). See also *Jamestown, W. & N.R.R. Abandonment,* 217 I.C.C. 739, 740 (1937); more recent cases cited in *New Haven Inclusion Cases,* 399 U.S. 392, 472 n. 74, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); C. Cherington, The Regulation of Railroad Abandonments 172 n. 42 (1948). The Government argues that, having fair assurance that the Commission would include such a clause, no rational purchaser, public or otherwise, would pay more than salvage value unless required to do so by the threat of a higher competitive bid.

Although we do not preclude the Government parties from further argument on this point, we are not much persuaded. The purpose of such clauses is, as stated in *Tennessee Central Ry. Abandonment,* 333 I.C.C. 443, 455 (1968), to insure that an applicant for abandonment "give first consideration to any offer for acquisition which contemplates continued operations over all or substantially all of its line of railroad." The Commission's specification of salvage value has occurred in contexts in which the owner was proposing to scrap the branch and had no better alternative in view. It is the continued operation, not preventing an owner from securing an optimum price, which is the Commission's prime objective. As the Commission stated in *Washington and Old Dominion Railroad Abandonment,* 331 I.C.C. 587, 599–600 (1968), *review action dismissed without need to discuss the point, Washington and Old Dominion Users Ass'n*

*v. United States,* 287 F.Supp. 528 (E.D.Va. 1968),

> Ordinarily the prescription of a price in the terms "not less than net salvage value" sets only the bidding minimum and guarantees that the abandoning railroad will not have to take less in a sale of the line intact for future operations than it could obtain by disposal otherwise. What price is actually paid depends, in most instances, upon circumstances, peculiar to each case—though not less than net salvage value. It might be the highest price bid above scrap value; or a price stated by the carrier as satisfactory to it; or some amount above a stated salvage value; or a price negotiated at arms length by the abandoning line and the acquirer.

Although this was said in a case where the proposed disposition at a figure higher than salvage value was for highway rather than railroad use, the Commission has also refused to use the salvage clause as a means for limiting the amount which a railroad seller may obtain from a railroad purchaser. *Chicago, M., St.P. & P. R.R. Abandonment,* 347 I.C.C. 1, 2 (1973). The Commission there said it was of the view:

> that in prior proceedings involving conditions such as that herein, the Commission has not undertaken to set the *maximum* price for the sale of such trackage [see, *Washington & Old Dominion R. Abandonment—Virginia,* 331 I.C.C. 587, 599 (1968)]; that it has been recognized, among other things, that to do so would be an unwarranted interference with the contractual rights of the parties; that setting a maximum price based solely on the net salvage value of the line might ignore other factors, such as the value of the right-of-way, having a reasonable bearing on a fair price for requiring continued operations of the line in the interest of the public; that in establishing the standard of net salvage value as a *minimum,* reasonable price, the Commission has been cognizant that a railroad should be able to recover at least this much of its capital investment in its line in exchange of foregoing the opportunity of selling

the trackage for other than transportation purposes or for possible usage of the trackage in other parts of its system . . ..

The Government parties have pointed us to no case where the Commission insisted on sale at salvage value where a purchaser for continued use, even in the absence of competition, was willing to pay more, and we are by no means certain that the Commission lawfully could attach a salvage clause in such a situation, even if, as apparently is not the case, its policy were to do so. Insofar as a statement in *New York, N.H. & H. R.R. Bondholders' Committee v. United States,* 289 F.Supp. 418, 435 (S.D.N.Y.1968), may indicate that the Commission could and would require a sale at salvage value where a public body would be compelled to pay more under a state condemnation statute, this was said in a case where there was no proof of interest by the public body in a consensual sale at a price above salvage value and without the court's having had the benefit of citation to the Commission decisions in the *Old Dominion* and *Milwaukee* cases, the latter of which had not yet been rendered.

Furthermore, it is not certain that all abandonments will have to await action by the Commission. In this Court's 1974 opinion, 384 F.Supp. at 919 n. 31, we stated our assumption that abandonment procedures might have to be pretermitted if a reorganization trustee ran out of cash after exhausting all reasonable efforts to raise it. The answering brief of the CNJ Trustee (p. 11 n. 9) considers this to be only one instance of a general principle that a certificate of abandonment is not required when cessation of operations is compelled by circumstances beyond the railroad's control. See also reply brief of *Penn Central Lien-*

*holders,* p. 26. Since this question is also important on the issue of the timing of sales for scrap, we prefer not now to decide how far our assumption or the broader argument noted is sound; it suffices that the points are sufficiently arguable that we would not wish to decide them against the transferors at this time.

Finally, transferors and creditor interests have cited examples in which public bodies vested with the power of eminent domain have paid more than scrap value for railroad properties desired for continued use even in the absence of competition and have given reasons why this behavior would not be irrational even if the arguments of the . Government parties with respect to salvage clauses were sounder than we now think them to be. Among these are the desire for a speedy settlement to prevent further decreases or deterioration of service; the possibility that a certificate of abandonment might not be required; the desire to acquire not simply physical assets but an operating organization; fear that a reorganization court might not approve a sale at salvage value; and the fact that state condemnation statutes might require payment of. more than scrap value so that a settlement may be cheaper as well as swifter than condemnation proceedings. For all these reasons we think that transferors and creditors should be free to develop realistic possibilities of sales of particular lines to public bodies at higher than scrap value even in the absence of proof of competition; the Government parties will, of course, be free to counter any such proof with any relevant evidence.[5] The Court calls attention to the procedure for handling the subject of sales for railroad use generally which is outlined in the June 16 Memorandum, 425 F.Supp. at 283, and urges that this process be expedited.

5. The Government will doubtless claim that a state would not be interested in making the substantial payments required for taking over main line (as distinguished from commuting) operations without assurance that other states would take similar action to the extent required to constitute a viable system. The transferors thus might be well advised in their own interests to develop an "alternative scenario" (or a number of such scenarios) of the sort discussed in the statement of contentions of the Government parties (see June 16 Memorandum, 425 F.Supp. at 282–283).

### V. *Net liquidation value vs. constitutional minimum.*

In the June 16 Memorandum, 425 F. Supp. at 283, we stated:

> A number of the transferors have advanced theories for determining NLV that seem to have nothing to do with "liquidation," particularly in the light of the discussion at p. 199 of the Conference Report. As at present advised, we believe that the place for these theories is in the consideration of the constitutional minimum, which we will discuss in Part V of this Memorandum. The briefing and argument of the validity of these theories which is there directed can include the point raised in the two preceding sentences.

Despite this, the brief of the New Haven Trustee [6] contains an extensive argument that NLV should be read as the equivalent of CMV. Although we shall abide by our commitment not to decide this issue until the briefing and argument of subject (6), we think that since the issue has been ventilated, it would assist the parties if we stated why, whatever the desiderata might be, we are unconvinced at the moment that a determination of net liquidation value embraces all the elements that may be called for in determining the constitutional minimum.

The Rail Act as adopted on January 2, 1974, 87 Stat. 985, did not require a determination of net liquidation value. Neither did the Senate version of the 1976 Act, S. 2718, 94th Cong., 1st Sess. The provision in the Senate bill for determining the base value of the certificates of value was that this "shall be the value obtained by taking the constitutional minimum value, if any (as determined pursuant to section 303(c)(1) of this title)," plus and minus certain items.

In passing the bill in this form the Senate overrode an objection from the Secretary of Transportation reading as follows:

> The base value of certificates of value should not be established at whatever figure the Special Court designates as the constitutional minimum. Such a provision will seem to signal a congressional repudiation of both USRA's net liquidation value theory and Congress' own intention in the Regional Rail Act to provide for a reorganization, not a condemnation, of the bankrupt railroads.

S.Rep.No.499, 94th Cong., 1st Sess. 315–16 (1975). The House Committee, however, substituted the words "the net liquidation value, as determined by the special court" for the Senate's "constitutional minimum." H.R. 10979. The Report of the House Committee on Interstate and Foreign Commerce, H.R.Rep.No.725, 94th Cong., 1st Sess. 121 (1975), accurately described the House version but did not explain the reason for the change from the Senate's. It did contain a letter from the Secretary of Transportation commending "the improvements the Committee made to the provisions on certificates of value" and indicating that if these were to be changed on the floor, "the bill would not be acceptable to the Administration". *Id.* at 282. Faced with this, the Conference Committee adopted the House version, with no explanation other than that

> The role of the certificates of value is to assure that these private interests will fare no worse than under the liquidation alternative.

H.R.Rep.No.781, 94th Cong., 2d Sess. 199 (1976).

---

**6.** This brief disregards the limitation imposed by us on granting intervention to the New Haven Trustee, namely, that this was "for the limited purpose of presenting contentions pertaining specifically to properties transferred by the New Haven estate to Penn Central." June 16 Memorandum, 425 F.Supp. at 288. Our object in allowing intervention by the New Haven Trustee was to permit him to present contentions arising out of the inclusion of the New Haven in the Penn Central, such as, to take one example, a claim that the New Haven's properties having once been valued should not be revalued except to take account of subsequent dispositions and the fact that certain properties were not transferred to ConRail. It was not and is not our intention to allow the New Haven Trustee to intervene to present positions with respect to valuation issues where the New Haven's interest as a creditor of Penn Central is adequately represented by the Penn Central Trustees.

We may agree with the New Haven Trustee that it is hard to see how the change demanded by the Secretary of Transportation benefits the Government in the long run. If the certificates of value, determined on the basis of net liquidation value, plus and minus the other elements requiring consideration, are less than the constitutional minimum, a figure which this Court, subject to review by the Supreme Court, was necessarily left free to determine, the balance would be awarded—not indeed by action of this Court but as a result of further expensive and time-consuming proceedings in the Court of Claims. But quite obviously the Secretary thought he might be accomplishing a change in the standard for determining the base value of the certificates of value, and left Congress no feasible alternative save to go along. This history itself seems to preclude our reading the two terms to mean the same thing, even though the differences may not be so great as the Secretary thought. The term "liquidation" normally implies a sale, although not necessarily a sale for scrap value; the constitutional minimum may well be more—a point we reserve for decision after further briefing.[7] If this analysis is in error, the parties should clearly point out why.

## VI. *Procedure for valuation of property of secondary debtors and non-bankrupt transferors.*

■ There appears to be general agreement that, whatever this Court's ultimate responsibilities may be, the proceedings before the special masters should not concern themselves with the respective interests of lessor and lessee in an award for the same property. We endorse that conclusion and think it premature to consider how that issue should ultimately be handled.

With a few exceptions the parties seem also to agree that since it will be desirable (although not necessarily sufficient) to value the system of each primary debtor as a whole and since it may be that many elements of VOB (value of other benefits) and CUE (compensable unconstitutional erosion) can be determined only on a system-wide basis, we should appoint special masters with reference to the estates of the primary debtors (doubtless several in the case of the Penn Central) rather than designate separate special masters for each transferor (or group of transferors). We agree with that position. The contrary argument of a few rather small transferors, based largely on the supposed speed with which their problems could be solved, ignores the interdependence of all transferors created by § 303(c)(2) and the undesirability that initial determination by this Court and review by the Supreme Court should take place in what may be a wholly atypical case.

However, there is a difference of opinion whether each special master should content himself with a finding with respect to the system or conduct the hearing so as to enable him to make additional findings with respect to each transferor.

There would seem to be no doubt that under §§ 303(c)(1)(A) and 306(c)(4) findings as to each transferor will ultimately be required. The question therefore is one of relative convenience—will it be simpler and fairer to have the special masters arrive at figures for each system, which presumably we will review, and then start over again with respect to each transferor within the system, or to conduct the hearings in the estate of each primary debtor with a view to making the separate findings concerning various transferors that will ultimately be needed. We think the latter.[8] Certainly a transferor must be permitted at some time to present a theory (within the parameters established by this Court) resulting in a higher valuation for its property than would result from allocation of a system value; we would think this could better be

---

7. The strongest case would be where a piece of railroad which the Interstate Commerce Commission would allow to be operated shorn of unprofitable track would earn an income whose capitalized value would exceed net liquidation value.

8. There are some instances in which a line is leased or controlled by more than one primary debtor; in these cases the parties have reached or are in the course of reaching agreement as to the estate in which the valuation is to occur.

done in the same proceeding in which the primary debtor is presenting its theory, particularly since a higher value for the property of one transferor might reduce the value of the properties of others. Generally time will be saved if the parties address themselves to the question of relative shares at a date when the necessary figures are more likely to be available rather than postpone the problem to a distant future when records and knowledgeable witnesses may have disappeared. On the other hand, we shall expect the various transferors to live up to their promises of cooperation with the primary debtors and the masters in an effort to minimize time and expense.

Finally, referring to Part II(4) of the June 16 Memorandum, we note that no party has taken the position that the last sentence of § 209(e)(1)—the "reckless or deliberate disregard" clause—applies to valuation proceedings under §§ 303(c)(1)(A) and (B) or 306(c)(4). Accordingly the Court will consider the taking of any such position to be foreclosed.

ADDENDUM

In the Matter of the Valuation Proceedings under §§ 303(c) and 306 of the Regional Rail Reorganization Act [1]

Misc. No. 76–1.

SPECIAL COURT REGIONAL RAIL REORGANIZATION ACT.

June 16, 1976.

MEMORANDUM AND ORDER DIRECTING PRELIMINARY PROCEEDINGS FOR THE DETERMINATION OF GENERAL PRINCIPLES UNDER §§ 303 AND 306 OF THE ACT

I. *Historical background and general considerations.*

In this Court's opinion of September 30, 1974, 384 F.Supp. 895, 926 n. 53, we said

that, as we then envisioned, our initial task after the conveyances provided in § 303 of the Act, "would be, after suitable briefing and argument, to set the principles for valuing the properties conveyed." These principles would then be applied to specific properties by a number of special masters, whose decisions we would review. It would have been premature to attempt to analyze just what issues would benefit from such advance determination, and we likewise did not address ourselves to such questions as whether an initial setting of guidelines would require discovery or the taking of evidence.

The extensive amendments made in Title VI of the Railroad Revitalization and Regulatory Reform Act of 1976 have considerably augmented the difficulties of what already was probably the most gigantic task ever confided to a court. The added problems arise in considerable part from the Amendments' creation of a new form of security which is to comprise a part of the consideration payable to railroads that have transferred property to ConRail, namely, "certificates of value" (CV's), § 306, which are to be redeemed by USRA not later than December 31, 1987, § 306(c)(1); the CV's are guaranteed by the Secretary of Transportation, constitute general obligations of the United States, and carry the pledge of its full faith and credit, § 306(a). A separate series of CV's is to be issued to each transferor, § 306(b). Critical to ascertainment of the redemption price is our determination, § 306(c)(4), of the "base value" (BV) of each series. This is computed by determining the "net liquidation value" (NLV), to which the transferor may be entitled by virtue of transfer of property to ConRail, subtracting the value of other benefits provided under the Act (VOB), adding compensable unconstitutional erosion (CUE), and finally adding interest compounded annually at the rate of 8% per annum; to get the BV of each certificate, the figure just obtained is divided by the

---

1. The Court has adopted a new caption and docket number for general matters relating to the valuation proceedings under §§ 303(c) and 306. All papers subsequently filed in general proceedings dealing with valuation shall bear this caption and docket number. The Court will enter an order transferring from Docket Misc. No. 75–3 matters relating to these general valuation proceedings and also breaking Misc. No. 75–3 into various categories.

number of certificates in the series. The formula, omitting the interest item and the final division, thus is:

$$BV = NLV - VOB + CUE$$

A principal problem is that this new concept was superimposed on the concepts of "public interest," "fair and equitable," and "constitutional minimum" in § 303(c) without any clear indication in the statute itself, as distinguished from the legislative history, what Congress considered was the relationship of the securities issuable to the transferors[2] as prescribed by § 306 and the standards laid down in § 303.[3]

The added complexities created by the 1976 Amendments seemed to us to heighten the necessity for this Court to make as many determinations of law as possible, at least in a preliminary fashion, before putting the special masters to work. Putting aside for the moment the secondary debtors of Penn Central (PC) and the non-bankrupt lessors, we have seven primary debtors, and it is apparent that more than one special master will be required in the case of Penn Central and perhaps in that of the Erie-Lackawanna (EL) if undue delay is to be avoided;[4] realistically therefore when we speak of special masters, we are thinking in terms of at least ten.

Because of such considerations the Court, on March 9, 1976, sent a letter to all members of the Acting Liaison Committee which the Court had appointed, outlining the Court's tentative views of what legal issues required decision and raising a number of procedural questions. This led in turn to the Court's order of April 26, 1976, pre-scribing a procedure whereby all parties were invited to file statements commenting on the issues and the structure of this proceeding, with an opportunity to file answers responding to the statements of others. The order also set forth a procedure whereby persons not named as parties might apply for leave to intervene. The Court has now reviewed these statements and answers, many of which have been exceedingly helpful.

While substantially all the comments recognize the existence of some questions which the Court may now determine after appropriate briefing and argument, most take a rather parsimonious view on this score. Although professing to recognize the necessity of providing the special masters with guidelines, many of the proposals seem to be that the special masters shall take evidence on whatever theory passing the lowest threshold of rationality may be offered to them.[5]

We think this would produce utter chaos. If a transferor or security holder[6] is allowed to offer evidence based on a certain theory of value, the Government parties[7] could not afford simply to argue that the theory was wrong; they would be obliged to cross-examine and offer rebuttal on the detailed application of the theory since for aught that would appear we might adopt it. Similarly the special masters would be obliged to make factual findings with respect to all theories even though we were to relieve them of the task (which we would reserve for ourselves) of choosing among them.

> Therefore, the only proper instructions that this Court can give the Special Masters is to hear all evidence pertaining to value each party desires to introduce and to structure the appropriate theory of valuation at the end of the proceeding.

2. We use the term "securities" to include other forms of consideration moving to a transferor.

3. The problems would have been less under the bill as passed by the Senate which used the phrase "constitutional minimum" instead of NLV.

4. The valuation of the New Haven took four years even though there was general agreement that the property should be valued primarily on a scrap value basis.

5. Thus the statement on behalf of Reading Company and its wholly-owned subsidiaries says (p. 13):

6. We use this term to include indenture trustees.

7. For present purposes, we include ConRail along with the United States and USRA in the term "Government parties."

While we respect the zeal displayed by the parties, there are other considerations that must be borne in mind. The PC has already been in reorganization for six years, the CNJ still longer, and the New Haven since 1961. It has now become apparent that a good many months will elapse before the special masters can profitably be put to work in any event. It is impossible to predict how long their labors will take under the best of circumstances, and if we had not already determined the proper principles we would be at the mercy of the slowest, since otherwise our determination in the earlier cases would govern the later ones without having afforded the parties in such cases a hearing. After the masters' reports will come our own consideration and decision on a mammoth record, an appeal to the Supreme Court, and possibly proceedings in the Court of Claims. Until all these steps, save perhaps the last, have been completed, the reorganization courts will be unable to make meaningful progress with their individual plans and the expensive administration of these estates, some of which are understood to be on the verge of actual insolvency, must continue. Indeed we have considerable doubt whether, under the procedures proposed by some parties, the CV's could be valued by December 31, 1987, their redemption date. The legal and other expenses of the litigation in this Court will be tremendous in any event and would become even more staggering and a legitimate subject for public concern if the litigation were protracted beyond the necessities of the case. Given all this and the fact that no procedure can produce a mathematically perfect result, it behooves all concerned with this proceeding to cooperate in devising procedures that will shorten the interval before final decision to the full extent compatible with essential fairness. We believe it is possible to devise procedures that will enable us to decide a large number of basic questions before the special masters go to work, although there are other matters on which there is no need for an early decision. In saying this we are conscious of the risk that by making some preliminary rulings we may be courting reversal by the Supreme Court and the need of starting all over again; we simply think the danger of this to be less serious than the consequences of letting the special masters proceed as some of the parties have proposed, see fn. 5. Indeed, as this Memorandum progresses, the need for our making a considerable number of preliminary rulings will become even more evident.

We add one final prefatory note. The complexity of this case, as revealed by the statements submitted to us, has convinced us that the many preliminary issues that must be considered are best addressed in several separate units. What follows is a delineation of these units, with instructions to the parties and intervenors as to how they should proceed as to each. For the convenience of the parties we annex a schedule of the dates fixed for various steps in these preliminary proceedings.

II. *Questions which the Court can now decide without presentation of factual material.*

There appears to be almost complete agreement that the Court may now decide, without taking any evidence, what we characterized in our March 9, 1976 letter as the "first set" of § 303 issues; indeed there appears to be a fair amount of agreement how we should decide them. Accordingly we shall set these and some other matters for briefing and argument in accordance with the schedule outlined below:

Initial briefs—August 23, 1976

Answering briefs—September 21, 1976
Time requests for oral argument shall be filed with the answering briefs. In this and all other cases dealt with in this Memorandum and Order, the parties shall arrange for joint briefing and argument to the maximum extent possible and shall keep the length of briefs to the minimum. After studying the briefs and time requests, the Court—perhaps after a preargument conference—will advise the parties of the time, place and organization of the argument.

In light of the statements, we deem it desirable to sharpen the issues as follows: [8]

(1) *"Public interest."* The first question raised in our March 9 letter concerned the nature of our responsibility under § 303(c)(1)(A) to determine whether the transfers and conveyances "are in the public interest . . .," especially in view of the description of judicial review in the second sentence of § 209(a) and the statement on p. 187–88 of the Conference Report of January 23, 1976. Several parties suggest that we need only determine that Congress had a rational basis for enacting the Rail Act and make no suggestion that it did not. If that is right, this issue can be regarded as substantially out of the case. However, two other views emerge from some of the statements.

One of these is that the "public interest" test requires us to pass on the viability of ConRail. At the moment we do not understand why we need to do this, just how we should go about it, or what we could do if we decided in the negative since a major reconveyance does not appear to be feasible. If any parties espouse this view, they should develop it in briefs.

The other such view is that although the "public interest" test may have little or no significance for the main body of the conveyances, it may require us to pass on the inclusion of certain peripheral properties or to decide whether, if the Act be regarded as a condemnation statute, certain properties were taken for something other than a public use.[9] It is hard to consider the question *in vacuo.* Any transferor or security holder allowed to intervene who asserts this position shall include in its brief illustrative statements of the properties in respect of which such a claim is made and the supporting reasons; the answer of the Government parties need meet such claims only with respect to legal issues since evidence would have to be taken if the Court were to decide there is need to pursue the matter further. In other words, what the Court needs is factual material sufficient to enable it to decide whether, if any such claims are made, they have sufficient legal merit to require further development of the facts.

(2) *"Fair and equitable."* The second question propounded in the March 9 letter concerned the construction of the "fair and equitable" language in § 303(c)(1), especially in view of the facts (a) that if the consideration is "fairer and more equitable than is required as a constitutional minimum," § 303(c)(3) requires us to eliminate the excess, and (b) that if the consideration were less than the constitutional minimum, it would not be fair and equitable.

Almost all, perhaps all, the statements seem to agree that the fair and equitable language serves no significant function in the determination of the value of any particular property, although several parties (including the Government parties) have suggested that this language may have a bearing on the allocation of ConRail's Series B Preferred and common stock. There is no need to rule on the latter suggestion now, since it will not be a matter for immediate consideration by the masters. Accordingly the Court will consider the "fair and equitable" issue to have been removed from the process of valuing the properties of individual estates or other transferors unless this is raised in the briefs to be filed as above indicated; any person taking such a position shall state with precision and not merely in conclusory terms how the "fair and equitable" test differs from the constitutional minimum test with respect to valuation in the context of the Act as it now stands.

The March 9 letter also raised the question whether the Court was bound to ascertain by what amount the consideration was less than fair and equitable and, by the

---

8. It should be clearly understood that any expressions in this Memorandum and Order which relate to the merits or to procedures not herein prescribed are designed solely to assist in structuring these proceedings and do not indicate a prejudgment.

9. Here, as elsewhere in this Memorandum, we will take it for granted that parties who wish to establish that a question that has been raised has constitutional as well as statutory dimensions will develop the point in their briefs.

same token, less than the constitutional minimum, even though the Court might have no effective way of remedying the defect. Further consideration had led us to an affirmative answer even before receipt of the statements; several of these suggest this and none opposes. Accordingly there is no need to brief this issue.

We pass now to certain other questions of law which we believe the Court may now be able to decide, without taking evidence. These should be briefed and argued in accordance with the schedule set out above, 425 F.Supp. at 278.

(3) *Reorganization vs. eminent domain statute.* Although not raised in the March 9 letter, a question lurking in the case is whether the standard of valuation [10] should be different if the Act be regarded as a reorganization statute, as an eminent domain statute or as both. At the moment the Court does not perceive that it should be. Any parties taking a different view should include arguments on that score in their briefs. Some parties also intimate that there may be different procedural requirements if the Act is regarded as an exercise of eminent domain; any party taking this view should brief it.

(4) *"Reckless or deliberate disregard."* We include this item in the list, although it may not fit the caption. In the last paragraph of the March 9 letter, we stated we would "like to be promptly advised whether USRA, the United States, ConRail, or any other party represented on LC [Liaison Committee] takes the position that the last sentence of § 209(e)(1) has any application in proceedings under § 303(c)(1)(A) and (B) or 306(c)(4)" since, if they did, the Court would desire to receive briefs and hear argument on the statutory and constitutional questions that would be raised. USRA has advised the Court that it does not take that position. Unless any party advances that position in its opening briefs, see 425 F. Supp. at 278–279, *supra*, the Court will consider that the taking of such a position with respect to proceedings under the cited sections is foreclosed.

(5) *Method of handling the valuation of property not owned by a primary debtor.* The discussions of valuation in the statements of the primary debtors and their security holders seem to assume, without detailed discussion, that the properties are first to be valued for each estate and that the total will then be distributed, in some way not clearly defined, as between the constituent transferors. This is an almost necessary consequence of the view, espoused by several primary debtors and their security holders, that the transferred property is to be valued as a going concern, and also conforms to what we understand to be the general practice in condemnation proceedings. The FSP, Vol. I, pp. 126, 145, shows separate values for each of the subsidiary debtors of Penn Central, and Appendix A to the Master Liquidation Plan and Summary of Valuation Reports dated March 1, 1976 gives a more detailed breakdown. The statements filed by the lessors seem to assume that they will receive the full value of their properties, without regard to the interest of the lessees; we have not been informed of the position of the latter. It may be that we have here a whole new set of issues which have thus far received relatively little thought.

The Court confesses it is somewhat baffled by the problem which bears, among other things, on the number and the duties of the masters to be appointed, and would welcome detailed proposals and briefing, even though it may be premature to attempt a definitive decision at this time. All parties desiring to express views on how this problem should be handled shall file briefs not later than August 23, 1976, answering briefs not later than September 21, 1976, and time requests for oral argument along with the answering briefs. The Court will then determine what further proceedings shall be had.

---

**10.** We use this phrase so as to exclude for present purposes the question whether to the extent that the statute is an eminent domain statute, as the non-bankrupt transferors claim it necessarily is as to them, and as some other parties claim as well, the Constitution requires that the consideration be paid in cash.

III. *"Net liquidation value."*

It is clear that, under § 306(c)(4), the Court is bound to determine the net liquidation value to which the transferors are entitled by virtue of transfers of rail properties to ConRail under § 303(b)(1) as a step in determining the BV of the CV's, whether the value of the securities (including the CV's) issuable to the transferors is the same as or more or less than the constitutional minimum value (CMV). The statements, however, reveal serious differences of opinion how this task should be performed.

A.

USRA's approach is summarized in FSP, Vol. I, pp. 124–26, and is stated in considerable detail in an Appendix, Vol. I, pp. 141–55. The essence of USRA's method is captured in the following paragraphs on p. 125:

> To resolve these and other issues, USRA postulated a "master liquidation plan" describing in detail an orderly process for the disposition of each estate's assets. The key assumption of the plan is that the estates would be required to sell substantial assets for continued rail use but that the prices for such sales would be regulated and fixed at the pricing levels which would obtain if all rail operations over the lines of the bankrupts actually ceased and as if the assets of the railroads in reorganization actually were dismantled and disposed of for other uses. USRA assumed further that because of the valid requirements of common carrier regulations, the estates would operate under subsidies, if need be, and maintain their rail operations until 1979, at which time the orderly liquidation would begin. This subsidy period is also consistent with the self-interest of the estates in maintaining healthy price levels for their assets. USRA's plan also makes the favorable assumption that orderly cessation actually occurs and, therefore, prices are not adversely affected by the economic dislocations which would result if the actual service termination were abrupt and not orderly. The master liquidation plan also recognizes the physical requirement for preparing assets for sale and their effect on the timing of asset disposition.
>
> In essence, then, the liquidation plan postulated by USRA is for an orderly transfer of the transportation services provided by the estates to other railroads with the prices of such transfers computed as if the estates had actually been allowed to exercise their asserted right to liquidate by selling all of their assets for nonrail uses. The pricing under the assumption of total liquidation is based on supply and demand conditions which such a time-phased liquidation of rail assets into nonrail uses would produce. The pace of asset disposition is tied to the time required to accomplish a transition to alternate modes and to prepare assets for sale.

We have no doubt that this is one theory of determining net liquidation value that must be considered. However, as indicated in the March 9 letter, even if USRA's general theory were to be accepted, its calculations depend on a considerable number of assumptions which are open to contest.

We cite as examples, but without limitation, "[a]ssessments of the time and cost of preparing the assets for sale, and the expected time required to dispose of such assets once prepared for sale in light of supply and demand conditions" (p. 125); "[t]he overall economic environment within which these activities would occur" (p. 125); the method for arriving at the discount factors stated at p. 126; the details of the calculations as to when all necessary authority to sell rail properties would be obtained, pp. 145–46 (including the question whether, if certain transferors would have been obliged to shut down for lack of funds, any such authority would have had to be obtained); what was done in regard to properties that may be "rail properties" within the Act but are not in the sense that authority to sell would have to be obtained; and the assumptions with respect to the determination of the value of rolling stock (pp. 146–48), facilities (pp. 148–49) and real estate (pp. 149–51).

In order to avoid wildly conflicting approaches by the masters appointed to deal with particular transferors, it seems essential that the Court, perhaps with the assistance of one or more special masters, should pass on the general validity of these assumptions, even though we recognize that any decision on this would simply establish something like a presumption which could be challenged by any transferor, e. g., by showing that it could have obtained authority to abandon at a date earlier than that hypothesized by USRA (or would not have required such authority because of lack of funds or for other reasons) or that it was in a peculiarly favorable position to sell rail ties. The transferors insist that before anything can be done in the way of briefing, there must be extensive discovery of the details of USRA assumptions and the basis for them.

While we agree that some discovery is needed before there can be any effective briefing, we believe this should be in two stages. The first stage would be devoted to general questions such as those we have outlined. The second stage, which could go on while we were considering these general issues, would relate to more specific matters, e. g., the correctness of the count of rolling stock, track, etc., or the validity of the choices of other real estate sales selected to determine market value.

USRA has now taken an important first step by serving on the parties copies of its Master Liquidation Plan and of five valuation reports. While we do not anticipate that these will satisfy transferors even with respect to first stage discovery, this submission should suffice to enable them to formulate requests, which can then form the subject of consideration by the Acting Liaison Committee, substantially as proposed in the June 7, 1976 response of the Government parties, pp. 13–15. We direct the parties and the Acting Liaison Committee to proceed along these lines with respect to what we have characterized as first stage discovery of NLV methodology used by USRA and by any of the transferors and the Acting Liaison Committee to report to us no later than August 23, 1976.

B.

We now turn to another and more basic matter. The chief quarrel on the part of the transferors and security holders with USRA's general approach to the determination of NLV, summarized in the paragraph quoted from FSP, Vol. I, p. 125, as distinguished from the subsidiary assumptions leading to the final figures, and also as distinguished from the question whether CMV is higher than the value of the securities issuable to the transferors, relates to the second sentence. Many of the statements claim that, at least for certain properties, the maximum liquidation price would be attained by selling them for railroad use.[11]

We do not understand that the statements of the Government parties altogether dispute this, see pp. 12–17 of the opening statement and pp. 9–12 of the responsive statement. After outlining a formidable series of hurdles that, in their view, a transferor would have to overcome before he could establish that sale to another railroad would yield more than sales for non-rail use, and urging that on this account, "the Court should presume that no hypothetical combination of dispositions would have produced a value higher than that attainable in a disposition of all of the transferred properties for nonrail use," they concede that "[t]his presumption could be overcome by a showing by a transferor that . . . it could and would legally and feasibly have disposed of some or all of its properties, for rail use, at a value determined other than by reference to the value attainable in a liquidation for nonrail use," (p. 17).

11. This contention is to be distinguished from the argument that for certain segments the "highest and best use" would be retention by the transferor for railroad purposes. This sounds rather on the claim that CMV may exceed the value of the securities issuable to the transferors, although a determination of capitalized earnings would have evidentiary value for both.

The Government parties argue that before any transferor can be allowed even to attempt this showing, there must be a preliminary proceeding in which, as we understand it, all transferors seeking to make the attempt must develop a consistent "alternative scenario" and the Court is to pass upon its feasibility, considered as a whole. While the presentation of such a plan would greatly facilitate our consideration, the Government parties have not indicated how we could compel this. At the moment we are not persuaded that the procedure proposed by the Government parties is necessary or even feasible. The subject can be more intelligently considered when we know what transferors intend to show more advantageous dispositions for rail use and with respect to what properties.

Before we request transferors to advance their proposals, there seems to be a point of law the decision of which will importantly affect the proceedings. Several transferors appear to include in their claim that NLV should take account of higher prices obtainable for rail than non-rail use not only sales of certain properties to solvent railroads (or other private groups if any such were possible purchasers) but also sales of other properties to public bodies vested with the power of condemnation. At the moment we do not understand why in the absence of competing private purchasers, such public bodies could be expected to pay more than the NLV for nonrail use.[12] We think this question can be usefully briefed, argued and decided along with those enumerated in Part II, Items (1), (2) and (3). The question is this:

Assuming that in determining "net liqui-. dation value" as used in § 306(c)(4) the Court should take account of a higher price obtainable for certain properties on a sale for rail use rather than, as USRA proposed, "at the pricing levels which would obtain if all rail operations over the lines of the bankrupts actually ceased and as if the assets of the railroads in reorganization actually were dismantled and disposed of for other uses" (FSP, Vol.

I, p. 125), should the Court do this when the proposed sale is to a public body vested with the power of eminent domain, in the absence of proof of a private purchaser ready and willing to make the purchase?

Once the Court answers this question, the next step would be to require the transferors to enumerate the possible transfers they desire to have considered. It may be that, as suggested by the PC Trustees (p. 23), the transferors will require the aid of discovery to assist them in doing this; the Government parties say that on this and other subjects discovery should be reciprocal. USRA could expedite matters if it would promptly make available to transferors any information which it has in regard to the interest (or lack of it) displayed by private parties in acquiring parts of the properties conveyed to ConRail, including the history of the aborted negotiations with the Chessie and the Southern; the transferors should similarly make available to the Government parties facts as to efforts made by them to effect such sales. The mechanics for this should be discussed in the Acting Liaison Committee and included in the report directed above. When the transferors have formulated their proposals, it may well be desirable to utilize the two-phase process suggested by the PC Trustees—a first phase in which the Court, perhaps aided by a special master, would determine the feasibility of the proposed transfers, and a second phase ascertaining the prices that would have been obtainable.

A number of the transferors have advanced theories for determining NLV that seem to have nothing to do with "liquidation," particularly in the light of the discussion at p. 199 of the Conference Report. As at present advised, we believe that the place for these theories is in the consideration of the constitutional minimum, which we will discuss in Part V of this Memorandum. The briefing and argument of the validity of these theories which is there directed can include the point raised in the two preceding sentences.

12. Except, of course, in a situation similar to that envisioned in fn. 11.

IV. *Other problems in arriving at the Base Value of the Certificates of Value.*

· Since the discussion in Part III has taken us a considerable distance into the problems of § 306(c)(4), it will be convenient to complete our discussion of that section before returning to § 303(c)(1).

We think it would be desirable to separate the determination of BV into its three component parts, NLV, VOB, and CUE. We take it that Appendix A to the Master Liquidation Plan and Summary of Valuation Reports dated March 1, 1976 broadly reflects the position of the Government parties as to NLV. Any further revisions to take account of additional designations, property sales, and the changed conveyance date should be made promptly.

USRA has outlined its theories as to the determination of VOB in FSP, Vol. I, pp. 128–34. However, the FSP says that it had been "impossible within the statutory deadlines to arrive at any final quantification as to all categories of 'other benefits'"; that the figures given are at least in part "estimates and approximations"; and that USRA's "analysis will continue as regards both the quantification of established categories and the possible identification and quantification of additional categories." Most of the transferors claim that there are no, or few, "other benefits"; they also say that the failure of FSP to trace how the general principles stated on pp. 128–33 were translated into the figures in Tables 2 and 3 makes it impossible for them to voice their objections intelligently.

We think there is merit in the latter point, at least to the extent that the argument would be more meaningful if more details were known. We therefore direct USRA to prepare and file a more detailed explanation and calculation of VOB, taking such account as it thinks warranted of the criticisms in the statements. The objective would be to provide a statement in sufficient detail that we could rule on the issues of principle (i. e., whether a particular category did or did not constitute a benefit) on the basis of USRA's statement and oppos-

ing affidavits going into principle rather than detail and thereby eliminate, as to categories we might rule out, the need for further discovery or factual presentation. USRA is directed to file such a statement not later than December 1, 1976. Again we urge USRA to be as forthcoming as feasible in its statement; the more that is voluntarily disclosed, within the realm of reason, the better are the chances for our being able to issue instructions to the masters without unnecessary advance discovery and taking of evidence. We also take note of the contention of some transferors that the benefits, in whole or in certain categories, are negative, and the legal problem arising therefrom. We believe that, at the appropriate time, this also can be handled by briefs supplemented with illustrative factual material—not in the sense of determining precise figures but in that of deciding whether the contention that "negative benefits" should be added rather than subtracted, or the more modest proposal that a "negative benefit" in one category is to be offset against positive benefits in others, are legally sustainable.

Turning to CUE, it now appears to us that there are three sets of legal issues which can be determined without awaiting the completion of detailed studies on the subject; indeed a relatively early resolution of these issues is essential in order to enable us to direct what studies should be prepared, since USRA contends that there has been no CUE.

Two of these issues concern the period of erosion claims. The statement of the Government parties takes the position, p. 28 n.19, that there can be no valid erosion claim for any period prior to enactment of the Rail Act—a position finding at least some support in our earlier opinion, 384 F.Supp. at 925. The transferors disagree. Secondly, some transferors take the position that there can be valid erosion claims for periods after the March 31, 1976 conveyance with respect to property not conveyed. The Government parties presumably disagree. The third concerns the nature of the items qualifying as erosion claims. The state-

ment of the PC Trustees (pp. 11–12) helpfully subdivides erosion into "financial erosion" and "physical erosion." The former would include the four items mentioned in our earlier opinion, 384 F.Supp. at 923, and possibly others of similar nature. Physical erosion is the deterioration of plant which may result in a lower NLV for the properties conveyed and lower realizable values for those not conveyed. We think the two issues of dates and the issue of the nature of the items qualifying for treatment as CUE can be resolved, or at least narrowed, as a matter of principle on the basis of factual submissions without the taking of detailed evidence since we would not anticipate serious conflict on the facts. We direct that all persons making claims of CUE shall file not later than October 18, 1976 detailed statements with supporting briefs which shall include the following:

(1) The date when they contend that valid erosion claims began. These should be supported by inclusion of petitions, reports and orders in the various reorganization courts and financial data that are claimed to be relevant.

(2) Any date later than March 31, 1976 to which they contend that erosion continued. The statements should give some idea of the nature and amount of any such post-conveyance erosion claims and shall present the legal theory contended to support them.

(3) The categories (and some approximation of the amounts) of erosion claims.

The Government parties shall answer not later than November 15, 1976, and the claimants may reply not later than December 7, 1976. The Court will then set a date for argument.[13]

## V. *Constitutional Minimum Value.*

While, as mentioned in Part III of this Memorandum, Congress was of the opinion, Conference Report p. 199, that by providing for CV's it had assured the transferors of the constitutional minimum, that opinion is, of course, not conclusive. As also mentioned in Part III, we are presently of the view, while this is subject to change after brief and argument, that when Congress spoke of liquidation, it meant liquidation, although liquidation is not necessarily sale exclusively for nonrail use. Unless further briefing and argument should alter the view stated in the preceding sentence, we would consider, as previously indicated, that many of the contentions with respect to an expansive notion of NLV should rather be regarded as contentions that even an application of NLV taking full account of possible dispositions for rail use may not produce values equal to the constitutional minimum.

It would seem that if a railroad (or a segment which would have been allowed to operate pruned of unprofitable extensions) has capitalized earning power in excess of NLV, even in the "world" where most of the rail service provided by the bankrupt estates has ceased, the Constitution would require payment on that basis. If the Government parties contest this proposition, or desire to frame conditions about it which they believe we should impose as guidelines to the masters, they should include a discussion of this in their opening briefs.[14]

---

13. The Trustee of the Ann Arbor has raised an issue of law peculiar to it. Since this estate has conveyed no property to ConRail, it will not obtain CV's. The Trustee wishes us to decide whether we have power to enter a deficiency judgment for CUE under § 303(c)(3) and direct payment by the United States under § 303(c)(5). If we should decide in the negative, the Trustee would like to proceed directly in the Court of Claims. We think it preferable to defer decision on this at least until we have passed on the general questions with respect to erosion outlined above.

14. In our 1974 opinion, 384 F.Supp. at 928 n.61, we took note of a theory which we thought to be then suggested by the Government parties, namely, that the constitutional minimum might be less than liquidation value in the case of a railroad (or perhaps a segment) with earnings which were sufficient that it could not obtain permission to abandon but whose capitalized value was less than liquidation value. The Government parties do not now seem to urge this except for making the point that if ConRail has sufficiently large earnings, there may be no need for determining net liquidation value. If

Apart from this the statements and answers can be said generally to reveal the clash manifested by the majority and dissenting opinions in *In the Matter of the Port Authority Trans-Hudson Corp.*, 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967). Putting the matter in another way, they raise the issue whether and, if so, how far the Supreme Court would consider that the situations here presented require a departure from the standard that in condemnation "the question is what has the owner lost, not what has the taker gained," *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), and subsequent decisions. We see no reason why we cannot formulate at least a general position on this subject without requiring the special masters to take detailed evidence on some or all of the many theories of valuation that would run afoul of the quoted standard if this is applicable. In saying this we do not mean to limit the parties to ordinary legal briefs. If any party believes it would be helpful to accompany its brief by affidavits or offers of proof, it may do so; the Court will consider these not as proof of the facts stated but for the light they shed on the legal issues. Such a course will meet the Supreme Court's comments in *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 146, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), without requiring the vast expenditure of time and money that would follow from our leaving the issue of the constitutional minimum wholly at large until the masters have reported.

That issue, as we now see it, is whether the Constitution requires any valuation in excess of NLV properly defined, and as then used in § 306, plus any higher valuation of a railroad or segment derivable under the second paragraph of this Part V. Illustrative of the theories of valuation that would seem to fall if that question were to be answered in the negative are those propounded as theories of NLV in the statements of the Trustees of the Lehigh Valley, pp. 11, et seq.,[15] of the Erie Lackawanna, pp. 11, et seq.,[16] and of the Penn Central Trustees, pp. 9–11; those propounded as theories of the constitutional minimum in the statements of the Penn Central Lienholders, pp. 9, et seq.,[17] and the Committee of Secured Rail Creditors in the Penn Central Transportation Company Reorganization Proceedings;[18] the "true economic value" theory of the Penn Central Company; and the theory of the New Haven Trustee.[19]

the Government parties wish to preserve the contention adverted to in the cited footnote, they should also include an argument on this in their opening briefs.

15. Real estate at fair market value plus an assemblage factor;
Improvements at the higher of scrap value or going concern value:
Going concern value measured by a combination of:
Capitalized prospective earnings
Public usefulness (the price of reconstruction or of a substitute facility)
RCNLD in appropriate instances
Value in place (i. e., scrap value with no subtraction for dismantling).

16. Capitalized earning power as basis for sale to another railroad;
Gross liquidation value (i. e., no cost for dismantling) as basis for sale to another railroad;
"Special Value" to a public body (e. g., a state) calculated by some combination of:
Depreciated value of track
Market value of land, plus assemblage factor
Gross liquidation value

Value of a developed operating organization
Value of not having to develop more costly alternatives
RCNLD of special facilities;
"Residual Value"—i. e., value as an integrated network.

17. Value properties as an assembled unit (i. e., apparently as a "going concern") by an appropriate combination of:
Land at fair market value plus assemblage;
Track at depreciated value;
Related facilities at cost plus appreciation;
Intangibles at cost of production less obsolescence;
For special facilities, RCNLD;
Value to public in terms of costs of alternatives.

18. "[W]hat it would have cost an acquiring entity on April 1, 1976 to buy, in an arm's length transaction, the conveyed real estate and to then build an integrated rail system . . . on that real estate . . . ." (P. 4).

19. Presumption of reconstruction cost new less depreciation unless the Government parties rebut this.

We emphasize that by mentioning the contentions of these parties as illustrations we are not relieving others who contend for a value higher than that formulated in the first sentence of this paragraph.[20]

There are three subsidiary issues that appear to require special briefing:

The first is this: Assuming that our answer to the question put above were to be generally in the negative, are there specific properties as to which valuation on the basis of NLV or a higher value based on capitalized earnings would be so manifestly unfair, because both factors work out at or near zero, that a higher value must be found and, if so, on what basis? This is essentially the question put by Judge Keating with respect to the Hudson River tunnel properties in *In the Matter of the Port Authority Trans-Hudson Corp., supra,* 20 N.Y.2d at 470, 285 N.Y.S.2d at 31, 231 N.E.2d at 739–40. While long tunnels of this sort are the paradigm, the transferors are invited to suggest other categories.

A second question, raised by the statement of the New Haven Trustee, is whether there is any requirement that the properties conveyed by the New Haven to PC should be valued on any higher basis than other properties.

A third issue, raised explicitly by the Lehigh Valley Trustee (pp. 23–24) but potentially of broad application, is whether the Constitution requires that compensation be given for any diminution in value of the assets severed and then left with the transferors, on a theory of inverse condemnation or otherwise. Here again, we would expect those propounding this point to give sufficient examples to enable the Court to understand the nature of the claimed diminution, not necessarily in dollar amounts but by categories.

We recognize the possibility that, after the briefing and argument here directed, we may decide that some of the issues propounded in this Part V are not ripe for

decision, or may determine to afford the special masters greater leeway (possibly in the form of permitting requests for further instructions) than we now contemplate. Nothing will have been lost, however, since the issues set forth in this Part V will have to be briefed and argued at some time in any event, and the benefit attainable from our ruling in 1977 rather than many years later, after prodigious efforts before and by the special masters, which may be unnecessary, is so tremendous.

Recognizing that the issues raised in this Part V are of great consequence and that factual materials may need to be assembled, we shall allow considerably more time for the filing of papers. We set the following schedule:

Presentation of proponents—January 6, 1977

Presentation of Government parties—February 20, 1977

Replies of proponents—March 18, 1977

We shall defer fixing a date for argument until the papers have been filed.

## VI. *Petitions for leave to intervene.*

■ In view of the large number of parties entitled to participate in these proceedings as of right, the Court cannot be as liberal in granting interventions as it might like to be. Indeed in some ways the intervention of creditor and stockholder interests may be counterproductive; insofar as they merely repeat arguments already ably made by transferors, they diminish the force of the latter. Paraphrasing Mr. Justice Stewart's well-known remark in *New York Times Co. v. United States,* 403 U.S. 713, 729, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), when everyone is heard, no one is heard. We are also mindful of the considerations concerning expense mentioned in Part I of this Memorandum. We are therefore granting intervention in these proceedings for the establishment of general principles to intervenors who have demonstrated a legal interest in the outcome and have

20. We have not mentioned the contentions of the Government parties as to "ConRail use value" since we do not understand their precise relevance. If the Government parties wish these to be considered as part of the proceedings here contemplated, they should make a further submission on the subject not later than August 15, 1976.

taken or propose to take positions different from that taken by the transferors. What interventions shall be granted in proceedings relating to the application of the general principles to specific properties can be determined later.

Applying this criterion, we grant intervention in the proceedings provided for in this Memorandum and Order to the following:

Institutional Investors Penn Central Group and certain Penn Central Indenture Trustees.

The First National Bank of Chicago as Trustee under First Mortgage Indenture of the Chicago River and Indiana Railroad Company, for the limited purpose of presenting arguments pertaining specifically to the C.R. & I.

Provident National Bank and A. Wakelee Swartz, Jr., as Indenture Trustees for Pennsylvania Tunnel and Terminal Railroad Company, and the Bank of New Jersey, as Indenture Trustee for New York Connecting Railroad Co., for the limited purpose of presenting arguments pertaining specifically to the named railroads.

Citibank, N.A., as Agent for the Committee of Secured Bank Creditors in the Penn Central Transportation Company Reorganization Proceedings, for the limited purpose of presenting in proceedings under Part V of this Memorandum and Order the theory of valuation discussed in its petition and accompanying statement.

Richard Joyce Smith, Trustee of the Property of the New York, New Haven & Hartford R.R. Co., for the limited purpose of presenting contentions pertaining specifically to properties transferred by the New Haven estate to Penn Central.

Penn Central Company, for the limited purpose of presenting in proceedings under Part V of this Memorandum and Order the issues outlined in its petition and accompanying statement.

The following applications are denied for lack of a sufficiently specific showing of inadequacy of representation by other parties in the proceedings provided for in this Memorandum and Order and, in some instances, for failure to file a statement of contentions as required by this Court's order of April 26, 1976:

Joint Application of Morgan Guaranty Trust Company of New York and eight other indenture trustees of Erie Lackawanna Railway Company.

Joint Application of Girard Trust Bank and four other indenture trustees of Lehigh Valley Railway Company.

Petition of John W. Sullivan, John D. Mabie, and Thomas A. Reynolds, Jr., minority stockholders of Reading Company.

Petition of Minority Stockholders of Mahoning Coal Railroad Co.

Petitions for leave to intervene have been filed on behalf of five governmental bodies listed in the margin.[21] As to almost all of the questions set forth in this Memorandum, we fail to see that these bodies have an interest justifying even permissive intervention; the only exception would be if a contention were to be made that some of the transfers were not in the public interest, see Part II(1). These petitions are denied without prejudice to applications for limited intervention in the event indicated.

This constitutes an order; the parties shall proceed in accordance herewith.

(s) Henry J. Friendly
Presiding Judge

(s) Roszel C. Thomsen,
Judge

### Schedule

*Subject*

(1) "Public interest"; "fair and equitable"; reorganization vs. eminent domain statute, reckless or deliberate disregard clause, § 209(a)(1)—see Part II, Items (1), (2), (3) and (4); relevance of possibility of sale for

---

21. The Commonwealth of Pennsylvania, the State of Delaware, the Department of Transportation of the State of New York, the Maryland Department of Transportation and the City of Philadelphia.

rail use to public bodies having power of condemnation, see Part III.

Opening briefs—August 23

Answering briefs—September 21

(2) Method of handling the valuation of properties not owned by primary debtors, see Part II, Item (5).

Opening briefs—August 23

Answering briefs—September 21

(3) Report by Acting Liaison Committee with respect to first stage discovery on NLV methodology and on efforts by USRA and transferors to effect sales for rail use to private parties.

August 23

(4) Date on which USRA shall file detailed statement of value of other benefits.

December 1

(5) Filing by transferors of statements and briefs with respect to compensable unconstitutional erosion: October 18

Response by Government parties: November 15

Replies: December 7

(6) Briefs (accompanied by affidavits or offers of proof) on constitutional minimum.

Opening briefs—January 6

Answering briefs—February 20

Reply briefs—March 18